**Josh Newton**, OSB# 983087
jn@karnopp.com
**Benjamin C. Seiken**, OSB# 124505
bcs@karnopp.com
Karnopp Petersen LLP
360 SW Bond Street, Suite 400
Bend, Oregon 97702
Tel: (541) 382-3011

*Of Attorneys for Amicus Curiae*
*The Confederated Tribes of the Warm Springs*
*Reservation of Oregon*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| DESCHUTES RIVER ALLIANCE, an Oregon nonprofit corporation, | Case No. 3:16-cv-01644-SI |
| Plaintiff, | The Confederated Tribes of the Warm Springs Reservation of Oregon's MOTION TO DISMISS Pursuant to Fed. R. Civ. P. 12(b)(7) |
| v. | |
| PORTLAND GENERAL ELECTRIC COMPANY, an Oregon corporation, | Expedited Hearing Requested |
| Defendant. | |

_____

# TABLE OF CONTENTS

CERTIFICATE OF COMPLIANCE WITH LR 7.1 ..................................................................... 1

MOTION TO DISMISS .......................................................................................................... 1

MEMORANDUM IN SUPPORT ............................................................................................... 1

I.      INTRODUCTION. ...................................................................................................... 1

II.     BACKGROUND. ....................................................................................................... 2

        A.      The Tribe. ................................................................................................... 2

        B.      The Pelton Project – Original License Period .......................................... 5

        C.      The Pelton Project – Relicensing Negotiations. ....................................... 8

        D.      The Pelton Project – Current FERC License. ........................................ 10

        E.      Fish Passage and Water Quality are Inextricably Intertwined. ............. 12

III.    THE SUBJECT OF THIS ACTION. ........................................................................... 14

IV.     ARGUMENT. ......................................................................................................... 14

        A.      Legal Standard For Rule 12(b)(7) Motion. ........................................... 14

        B.      The Tribe Has Profound Sovereign and Proprietary Interests That Are Legally
                Protected and Relate to the Subject of the Action. ............................... 15

        C.      Proceeding with the Action in the Tribe's Absence would, as a Practical Matter,
                Impair or Impede its Ability to Protect its Sovereign and Proprietary Interests
                That Relate to the Subject of this Action. ............................................. 17

        D.      The Tribe Cannot Be Joined Because of Sovereign Immunity ............. 19

        E.      The Case Cannot in Equity and Good Conscience Proceed Without the Tribe and
                Must Be Dismissed. ............................................................................... 20

V.      CONCLUSION ....................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Greyhound Racing, Inc. v. Hull,*
    305 F.3d 1015, 1023 (9th Cir. 2002) .................................................................. 16, 20

*Cachil Dehe Band of Wintun Indian of the Colusa Indian Cmty. v. California,*
    547 F.3d 962, 970 (9th Cir. 2008) ..................................................................... 15, 17

*Confederated Tribes of the Chehalis Indian Reservation v. Lujan,*
    928 F.2d 1496, 1499 (9th Cir. 1991) ......................................................................... 20

*Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.,*
    276 F.3d 1150, 1162 (9th Cir. 2002) ......................................................................... 21

*Dewberry v. Kulongoski,*
    406 F.Supp.2d 1136, 1148 (D. Or. 2005) ................................................... 15, 19, 20

*EEOC v. Peabody W. Coal Co.,*
    400 F.3d 774, 779-80 (9th Cir. 2005) ....................................................................... 15

*FPC v. Oregon,*
    349 U.S. 435 (1955) .................................................................................................. 10

*Harris v. County of Riverside,*
    904 F.2d 497, 503 (9th Cir. 1990) ............................................................................. 16

*Industrial Safety Equipment Ass'n, Inc. v. E.P.A.,*
    656 F.Supp. 852, 856 affirmed 837 F.2d 1115 (D. Col. 1987) ................................ 16

*Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.,*
    523 U.S. 751, 754, 760 (1998) .................................................................................. 19

*Lavan v. City of Los Angeles,*
    693 F.3d 1022, 1031-33 (9th Cir. 2012) ................................................................... 16

*Makah Indian Tribe v. Verity,*
    910 F.2d 555, 558 (9th Cir. 1990) ....................................................................... 15, 22

*Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma,*
    498 U.S. 505, 509 (1991) .......................................................................................... 19

*Salt River Project Agr. Imp. and Power Dist. v. Lee,*
    672 F.3d 1176, 1179 (9th Cir. 2012) ......................................................................... 15

*Santa Clara Pueblo v. Martinez,*
    436 U.S. 49, 58 (1978) ......................................................................................... 15, 19

i

CASES CON'T.

Shermoen v. U.S.,
   982 F.2d 1312, 1317 (9th Cir. 1992) ............................................................ 18

Union Pacific Railroad Company v. Runyon,
   320 F.R.D. 245, 250 (D. Or. 2017) ...................................................... 16, 17, 20, 21

Washington v. Daley,
   173 F.3d 1158, 1167 (1999) ........................................................................ 17

Wilton v. Seven Falls Co.,
   515 U.S. 277, 287 (1995) ........................................................................... 21

Winter v. Natural Res. Def Council, Inc.,
   555 U.S. 7, 22 (2008) ............................................................................... 21

STATUTES

16 U.S.C. §§ 825e et seq. ............................................................................ 21

18 C.F.R. Part 385 .................................................................................... 21

33 U.S.C. § 1365 ...................................................................................... 14

RULES

Fed. R. Civ. P. 19 .............................................................................. 1, 15, 20

OTHER AUTHORITIES

James C. Katsekas and Zoes J. Dimos,
   24 F.E.R.C. ¶ 61,028 (1983)………………………………………………...…………...17

Order Amending License and Modifying Project Operating Plan and Operations Compliance
   Plan
   111 F.E.R.C. ¶ 61,450 (2005) .................................................................... 11

Order Amending License and Modifying Project Operating Plan and Operations Compliance
   Plan
   130 FERC ¶ 62,162 (2010) ........................................................................ 11

Oregon Public Utility Commission
   Order No. 00-459 (2000) ............................................................................ 8

Portland General Electric Company and the Confederated Tribes of the Warm Springs
   Reservation of Oregon
   93 F.E.R.C. ¶ 61,183 (2000) ....................................................................... 8

Pub. L. 107-102, 115 Stat. 974 (2000) ............................................................. 8

ii

## CERTIFICATE OF COMPLIANCE WITH LR 7.1

The undersigned counsel certifies that the parties have made a good faith effort to confer on the issues in these motions but have been unable to resolve those issues.  Plaintiff, Deschutes River Alliance ("DRA"), opposes the request for an expedited hearing.  Amicus Curiae, The Confederated Tribes of the Warm Springs Reservation of Oregon ("Tribe")*, seeks an expedited hearing to minimize the prejudice to its interests as an absent but necessary party.  *See* Fed. R. Civ. P. 19, Advisory Committee Note (joinder question should be made with reasonable promptness).

## MOTION TO DISMISS

While expressly reserving its sovereign immunity, the Tribe moves the Court, pursuant to Rule 12(b)(7), for an order dismissing this action for failure to join the Tribe, a party required by Rule 19.  The motion is supported by the court file, the below memorandum in support, and the Declaration of Charles R. Calica ("Calica Dec.").

## MEMORANDUM IN SUPPORT

### I.    Introduction.

DRA seeks both declaratory and injunctive relief relating to the operation of the Pelton Round Butte Hydroelectric Project ("Pelton Project" or "Project").  DRA alleges that defendant Portland General Electric Company ("PGE") is operating the Project, specifically the Project's Selective Water Withdrawal facility, in violation of the water quality certification issued by the Oregon Department of Environmental Quality ("DEQ").  The Tribe has significant legally protected sovereign and proprietary interests that relate to the subject of DRA's action.  Those protectable interests include, but are not limited to, its sovereign authority arising from its

Page 1 -    THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF
OREGON'S MOTION TO DISMISS

1855 Treaty (defined below) to regulate the Project and the natural resources of the Deschutes River basin, including the fish resources of the lower Deschutes River, and to exercise rights to take fish in the Deschutes River.  The Tribe's protectable interests also include its interests as co-owner and joint licensee of the Pelton Project and its status as a party to the GSA (defined below) and the Relicensing Settlement Agreement (defined below).  The Tribe is a necessary party under Rule 19(a).

The Tribe possesses sovereign immunity, meaning that it cannot be compelled to join this action absent a valid waiver or Congressional abrogation of the Tribe's sovereign immunity. There is no waiver or abrogation that would apply to DRA's action against PGE.  Thus, it is not feasible to join the Tribe.

In light of the Tribe's substantial interests that relate to the subject of this action, the case cannot in equity and good conscience proceed without the Tribe.  Proceeding without the Tribe will substantially prejudice the Tribe.  There is no practical way to shape relief in a manner that would lessen that prejudice and still leave an adequate remedy for DRA.  There also appears to be an alternative forum before the Federal Energy Regulatory Commission ("FERC") where DRA could pursue remedies similar to those sought in this action.  For the reasons that follow, the Court should grant the Tribe's motion and dismiss this action with prejudice.

## II.    Background.

### A.    The Tribe.

The Tribe is a federally recognized, self-governing, sovereign Indian tribe.  (Calica Dec. ¶ 4.)  The Tribe consists of three Indian tribal groups:  the Warm Springs, the Wasco, and the Paiute.  (*Id*.)  The Tribe is the legal successor in interest to the Indian signatories to that

Page 2 -    THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON'S MOTION TO DISMISS

certain Treaty between the United States of America and the Tribes and Bands of Middle

Oregon, which was executed on June 25, 1855, and ratified by Congress on March 8, 1859

(12 Stat. 963) ("1855 Treaty" or "Treaty").  (*Id.*)

The Tribe is organized under a Constitution and Bylaws ratified by members of the Tribe

on December 18, 1937, and approved by United States Department of the Interior ("Interior") on

February 14, 1938, pursuant to Section 16 of the Act of June 18, 1934 (48 Stat. 984), as amended

on June 15, 1935 (49 Stat. 378).  (Calica Dec. ¶ 5.)  On April 23, 1938, the Tribe ratified a

Corporate Charter issued to it by Interior pursuant to Section 17 of the Act of June 18, 1934.

(*Id.*)

Pursuant to the 1855 Treaty, the Tribe has reserved approximately 640,000 acres of land

for exclusive use and occupation of the Tribe and its members as a permanent homeland

("Reservation").  (Calica Dec. ¶ 6.)  The Reservation is located in central Oregon and is bordered

on the east by the middle of the channel of the Deschutes River, on the south by the Metolius

River, on the west by the summit of the Cascade Mountain range, and on the north by the Tygh

Ridge.  (*Id.*)  The United States holds legal title to almost the entire Reservation in trust for the

benefit of the Tribe or its members.  (*Id.*)

The Tribe has approximately 5,300 members.  (Calica Dec. ¶ 7.)  Most Tribal members

reside on the Reservation.  The Tribe has significant levels of unemployment, exceeding thirty

percent (30 %), and high rates of poverty.  (*Id.*)  The Tribe is confronted with profound social

challenges associated with such unemployment and poverty, including, without limitation,

diminished life expectancy, low high school graduation rates, crime, and drug use.  (*Id.*)  The

Page 3 -    THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF
             OREGON'S MOTION TO DISMISS

Tribe depends on revenues that it receives from the Pelton Project to fund governmental services that it provides to its members. (*Id.*)

The Tribe has the inherent sovereign authority to make its own laws. (Calica Dec. ¶ 8.) State law does not generally apply to Tribal activity within the Reservation. Certain enumerated governmental powers are vested in a Tribal Council. (*Id.*) Tribal Council has eleven members, eight of which are elected positions. (*Id.*) The remaining three positions are lifetime chieftain positions, one for each of the three tribes (Wasco, Warm Springs, and Paiute). (*Id.*)

The Tribal Council oversees the Tribe's administrative services, including natural resource management (both within and outside the Reservation), a court system, police and fire protection, water and sewer services, and social services. (Calica Dec. ¶ 9.) The Tribe is dedicated to improving the quality of life of Tribal members and engages in various activities in the fields of health care, housing, education, and cultural development in order to achieve that goal. (*Id.*) Annually, the Tribe currently employs over 600 people in connection with its governmental activities. (*Id.*)

The Tribe has been conducting commercial activity on the Reservation since the 1940s. (Calica Dec. ¶ 10.) Pursuant to the Tribe's Corporate Charter, the members of the Tribe vote by referendum to establish a business enterprise for each commercial activity. (*Id.*) The Tribal Council also has the authority pursuant to the Constitution of the Tribe to establish subordinate organizations for economic purposes. (*Id.*) The Tribal enterprises are operated under written plans of operation and are overseen by boards of directors appointed by the Tribal Council. (*Id.*)

Page 4 -    THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF
            OREGON'S MOTION TO DISMISS

**B.      The Pelton Project – Original License Period.**

The Pelton Project is comprised of three dams (the Round Butte Dam, the Pelton Dam, and the Reregulating Dam) and certain related generating and transmission facilities. (Calica Dec. ¶ 11.)  The Project is located on the Deschutes River within and adjacent to the Reservation.  (*Id*.)  The Project operates as a modified "run of the river" system, meaning that the normal daily outflow from the Reregulating Dam, the dam farthest downstream, is roughly equal to the daily inflow to the Pelton Project.  (*Id*.)

In 1951, the Federal Power Commission ("FPC"), the predecessor to FERC, issued a 50- year license for the Pelton Project to PGE.  (Calica Dec. ¶ 12.)  The original license authorized the construction of the Pelton and Reregulating Dams; in 1960, the FPC amended the license, authorizing PGE to construct the Round Butte Dam.  (*Id*.)

In 1955, the Tribe and PGE entered into an agreement pursuant to which, in exchange for compensation, the Tribe granted PGE the easements and rights necessary for the construction and operation of (i) the Pelton Dam and the Round Butte Dam and the generation and transmission facilities associated with those dams and (ii) the Reregulating Dam. (Calica Dec. ¶ 13.)  The agreement also affirmed certain rights of the Tribe, including the right to construct, operate, and maintain power generation facilities in the Reregulating Dam.  (*Id*.)

PGE completed construction of the Pelton and Reregulating Dams by 1958 and completed construction of the Round Butte Dam by 1964.  (Calica Dec. ¶ 14.)  The Round Butte Dam is the uppermost of the three dams and impounds portions of the Metolius, Crooked, and Deschutes Rivers, forming Lake Billy Chinook.  (*Id*.)  The Pelton Dam is located seven miles downstream of the Round Butte Dam.  (*Id*.)  The Pelton Dam impounds the Deschutes River

Page 5 -      THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF
             OREGON'S MOTION TO DISMISS

creating Lake Simtustus, which extends back to the tailrace of the Round Butte Dam.  (*Id*.)  The Reregulating Dam is located below the Pelton Dam.  (*Id*.)  The primary purpose of the Reregulating Dam is to distribute the uneven discharges from the upper two dams to approximate natural river flows over the remaining length of the Deschutes River.  (*Id*.)

In 1979, the Tribe established Warm Springs Power Enterprises, now Warm Springs Power and Water Enterprises ("WSPWE"), for the purpose of constructing, operating, and managing the power generation facilities at the Reregulating Dam.  (Calica Dec. ¶ 15.)  Also in 1979, PGE and the Tribe filed a joint application with FERC to amend the Pelton Project license.  (*Id*.)  The purpose of the amendment was to obtain FERC's authorization for the Tribe to construct power generation facilities in the Reregulating Dam.  (*Id*.)

In 1980, FERC amended the license designating PGE and the Tribe joint licensees for the Pelton Project to the extent of their interests in the Project.  (Calica Dec. ¶ 16.)  FERC also authorized the Tribe to construct, operate, and maintain a powerhouse, transmission line, and appurtenances at the Reregulating Dam.  (*Id*.)  The Tribe subsequently constructed the authorized powerhouse, transmission line, and appurtenances at the Regulating Dam.  (*Id*.)

In 1985, PGE and the Tribe entered into a settlement agreement which resolved then-existing disputes between them.  (Calica Dec. ¶ 17.)  The agreement also established the compensation that PGE was to pay the Tribe through the remainder of the original license term, or December 31, 2001.  (*Id*.)

In December 1996, PGE filed a notice of intent to file an application for a new FERC license for the Pelton Project effective at the end of the term for the original license.

Page 6 -    THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON'S MOTION TO DISMISS

(Calica Dec. ¶ 18.)  Later that month, the Tribe filed a notice of intent to file a competing application for the Project.  (*Id.*)

In 1998, the Tribal Council adopted Ordinances 78 and 81.  (Calica Dec. ¶ 19.)  Those Ordinances are respectively titled "Hydroelectric Licensing and Regulation Ordinance" and "Implementing Provisions for Tribal Water Quality Standards, Beneficial Uses and Treatment Criteria."  (*Id.*)  Ordinance 78 is codified in Warm Springs Tribal Code ("WSTC") Chapter 475.  (*Id.*)  Ordinance 81 is codified in WSTC Chapter 433.  (*Id.*)

In December 1999, PGE and the Tribe filed final, competing applications for a new FERC license for the Project.  (Calica Dec. ¶ 20.)  In April 2000, PGE, the Tribe, and Interior entered into a Long-Term Global Settlement and Compensation Agreement ("GSA").  (*Id.*)  The GSA acknowledges that it is not intended to impair the Tribe's treaty-reserved rights, which include the rights of the Tribe to hunt, fish, gather roots and berries, and pasture livestock and include implied rights to water to support those rights.  (*Id.*)  The GSA also contains provisions relating to the settlement and release of claims among the parties.  (*Id.*)  Pursuant to the GSA, the Tribe granted certain rights to PGE including, but not limited to, easements for dams and equipment and flowage easements.  (*Id.*)  The GSA addresses PGE's obligation to compensate the Tribe for the Project's use and occupation of lands within the Reservation, which includes the sale of up to a 50.01 undivided interest in PGE's Project assets to the Tribe.  (*Id.*)  The GSA recognizes the Tribe's sovereign authority to exercise certain governmental powers over natural resources within the boundaries of the Reservation, specifically referencing WSTC Chapters 433 and 475.  (*Id.*)

Page 7 -    THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON'S MOTION TO DISMISS

Pursuant to the GSA, the Tribe and PGE entered into an Ownership and Operation Agreement for the Pelton and Round Butte Dams and Generating Facilities ("O&O Agreement").  (Calica Dec. ¶ 21.)  The O&O Agreement addresses the co-ownership, operation, and maintenance of the Pelton Project and appoints PGE operator of the Pelton and Round Butte facilities, but does not include the Reregulating Dam generating facilities; the Tribe remains operator of the Reregulating Dam generating facilities.  (*Id*.)

In August 2000, the Oregon Public Utility Commission ("PUC") approved PGE's application to sell up to a 50.01 percent ownership interest in PGE's Project assets to the Tribe.  OPUC Order No. 00-459.  In November 2000, FERC approved the GSA.  *Portland General Electric Company and the Confederated Tribes of the Warm Springs Reservation of Oregon*, 93 F.E.R.C. ¶ 61,183 (2000).  In December 2001, Congress approved and ratified the GSA effective April 12, 2000.  Pub. L. 107-102, 115 Stat. 974.

### C.    The Pelton Project – Relicensing Negotiations.

In June 2001, PGE and the Tribe filed a joint application amendment with FERC and jointly applied for a new license for the Project.  (Calica Dec. ¶ 23.)  That same month, the Tribe and PGE filed applications for water quality certifications for the Project pursuant to Section 401 of Clean Water Act with the Tribe's Water Control Board ("WCB") and DEQ.  (*Id*.)  The Tribe's WCB and DEQ cooperated on their certification activities, and, in June 2002, the Tribe's WCB and DEQ issued to both PGE and the Tribe water qualify certifications for the Project.  (*Id*.)  Both certifications reference and incorporate a Water Quality Management and Monitoring Plan ("WQMMP"), which is intended to provide a coordinated and integrated application of both certifications to the Project.  (*Id*.)

Page 8 -    THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON'S MOTION TO DISMISS

The Project did not meet all State of Oregon and Tribal water quality standards in the Deschutes River immediately below the Project.  (Calica Dec. ¶ 24.)  The water quality certifications issued by the Tribe's WCB and DEQ contain conditions designed to manage the Project's effect water quality.  (*Id*.)  While similar, the certifications are not identical. For example, the certification issued by the Tribe's WCB contains more detailed conditions relating to Fish Passage.  (*Id*.)  The Project's compliance with one certification does not necessarily result in compliance with the other certification.  (*Id*.)

In January 2003, PGE and the Tribe initiated settlement discussions with a group of stakeholders.  (Calica Dec. ¶ 25.)  A facilitated Settlement Working Group ("SWG") was formed for the purpose of resolving all issues associated with relicensing of the Pelton Project.  (*Id*.) The SWG met over a period of seventeen months, until June 2004.  (*Id*.)  Those settlement discussions produced the Settlement Agreement Concerning the Relicensing of the Pelton Round Butte Hydroelectric Project FERC Project 2030, dated July 13, 2004 ("Relicensing Settlement Agreement").  (*Id*.)  The parties to the Relicensing Settlement Agreement include, in addition to the Tribe and PGE:  Bureau of Indian Affairs ("BIA"); Bureau of Land Management ("BLM"); United States Fish and Wildlife Service ("USFWS"); National Marine Fisheries Service ("NMFS"); United States Forest Service ("USFS"); DEQ; Oregon Department of Fish and Wildlife ("ODFW"); Oregon Water Resources Department ("OWRD"); Oregon Parks and Recreation Department ("OPRD"); Deschutes County, Oregon; Jefferson County, Oregon; City of Bend, Oregon; City of Madras, Oregon; City of Redmond, Oregon; Avion Water Company; American Rivers; Oregon Trout; The Native Fish Society; Trout Unlimited; and WaterWatch of Oregon.  (*Id*.)

Page 9 -  THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON'S MOTION TO DISMISS

A key feature of the Relicensing Settlement Agreement is the Fish Passage Plan ("Fish Passage Plan").  (Calica Dec. ¶ 26.)  Since the Project's inception, fish passage has been a paramount concern for the Tribe and other fishery resource managers.  (*Id*.)  For example, the State of Oregon had raised objections to the original license issued by the FPC relating to the Project's anticipated effect on anadromous fish.  *See FPC v. Oregon*, 349 U.S. 435 (1955).  Those concerns were well-founded.  (Calica Dec. ¶ 26.)  The Project had problems with fish passage from the beginning and, by 1973, fish passage had been abandoned in favor of a hatchery.  (*Id*.)  The extirpation of anadromous fish from the upper Deschutes Basin above the Project has had a profound effect of the Tribe and its members; it is for that reason that the Tribe views the Fish Passage Plan as a principal component of the Relicensing Settlement Agreement.  (*Id*.)

### D.    The Pelton Project – Current FERC License.

In July 2004, PGE and the Tribe submitted the Relicensing Settlement Agreement to FERC for approval.  (Calica Dec. ¶ 27.)  PGE and the Tribe also submitted a document titled "Offer of Settlement and Joint Explanatory Statement And Request For Technical Conference" ("Explanatory Statement").  (*Id*.)  The Explanatory Statement provides that all parties to the Relicensing Settlement Agreement agreed that it was "fair and reasonable and in the public interest."  (*Id*.)  The Explanatory Statement also generally describes the Relicensing Settlement Agreement as a "complex package containing numerous interrelated and delicately balanced components."  (*Id*.)  In particular, the Explanatory Statement provides the resource protection measures in the Relicensing Settlement Agreement "make up a finely-crafted package, each

Page 10 -    THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON'S MOTION TO DISMISS

element of which is essential to the successful implementation" of the Relicensing Settlement Agreement. (*Id.*)

On June 21, 2005, FERC issued an Order Approving Settlement and Issuing New License ("2005 License" or "License").[1] 111 F.E.R.C. ¶ 61,450 (2005). The 2005 License is issued to PGE and the Tribe as joint licensees to operate and maintain the Pelton Project for a period of 50 years. (Calica Dec. ¶ 29.) The 2005 License mostly (but not entirely) follows the proposed license articles from the Relicensing Settlement Agreement. (*Id.*) The 2005 License is subject to the conditions set forth in water quality certifications issued by DEQ and WCB. (*Id.*) The 2005 License also provides that PGE and the Tribe shall conduct water quality monitoring pursuant to the WQMMP. (*Id.*) PGE and the Tribe must file annual reports to DEQ and the Tribe's WCB with copies to FERC and the Fish Committee. (*Id.*)

Consistent with the Tribe's interests, anadromous fish passage (both upstream and downstream) at the Project is a key component 2005 License. (Calica Dec. ¶ 30.) The License is subject to fishway prescription conditions submitted by Interior and NMFS pursuant to section 18 of the Federal Power Act. (*Id.*) The Fish Passage Plan was approved and incorporated into the 2005 License, subject to any modifications required by the License articles. (*Id.*) The License requires terms and conditions for implementing the reasonable and prudent measures filed by NMFS and USFWS in connection with the Project's effect on ESA-listed fish species—

---

[1]    Between the expiration of the original license and the issuance of the 2005 License, PGE and the Tribe operated the Project pursuant to annual licenses issued by FERC. (Calica Dec. ¶ 28.) In 2010, FERC issued an Order Amending License and Modifying Project Operating Plan and Operations Compliance Plan. 130 F.E.R.C. ¶ 62,162 (2010).

Page 11 -    THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON'S MOTION TO DISMISS

to wit, Middle Columbia River summer steelhead and bull trout.  (*Id.*)  Those reasonable and prudent measures include implementation of the Fish Passage Plan.  (*Id.*)

The 2005 License establishes certain implementation committees as provided in the Relicensing Settlement Agreement, including, without limitation, a Fish Committee. (Calica Dec. ¶ 31.)  Pursuant to the Relicensing Settlement Agreement, the implementation committees are meant to have a pivotal role in the administration of a large variety of post-licensing activities, including enhancement measures on behalf of fish and wildlife.  (*Id.*)

The Fish Committee consists of PGE and the Tribe in their capacities as licensees, along with NMFS, USFWS, USFS, BIA, BLM, the Tribe's Branch of Natural Resources ("BNR"), the Tribe's WCB, ODFW, and DEQ.  (Calica Dec. ¶ 32.)  The Fish Committee also includes representatives from the following non-governmental organizations:  Trout Unlimited, American Rivers, Oregon Trout, and the Native Fish Society.  (*Id.*)  The 2005 License designates NMFS, USFWS, ODFW, and the Tribe's BNR as the "Fish Agencies" and recognizes that each possesses distinct regulatory authority regarding the fishery resources implicated by the Project. (*Id.*)  The Fish Committee strives to conduct its business by consensus pursuant to the process set forth in the Relicensing Settlement Agreement and the 2005 License.  (*Id.*)

### E.  Fish Passage and Water Quality are Inextricably Intertwined.

Since time immemorial, the Tribe has recognized that a healthy fishery (both anadromous and resident) and water quality are inextricably intertwined. (Calica Dec. ¶ 33.)  For that reason, the Tribe has been a staunch advocate in multiple forums (international, federal, tribal, and state) for the recognition of that inter-relationship and the development of policies to manage water quality for the benefit of its treaty-reserved fisheries.  (*Id.*)  That policy is manifest in the 2005

Page 12 -   THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF
            OREGON'S MOTION TO DISMISS

License.  (*Id*.)  Both DEQ's and WCB's water quality certifications require PGE and the Tribe to provide for fish passage.  (*Id*.)  The WQMMP also recognizes that reintroduction of anadromous fish above the Project is a key mitigation measure under the 2005 License.  (*Id*.)

The 2005 License provides that the principal infrastructure improvement for *both* fish passage and water quality management is the construction of a selective water withdrawal facility ("SWW") at the existing Round Butte Dam intake tower.[2]  (Calica Dec. ¶ 34.)  The WQMMP provides that the SWW is designed to withdraw water from both the warmer surface water and the cooler bottom water.  (*Id*.)  The SWW is intended to achieve two important objectives: (a) help the Project meet temperature and water quality goals and standards in the lower Deschutes River and Project reservoirs; and (b) allow the withdrawal of surface waters during salmonid smolt migration periods to facilitate the capture of downstream emigrating smolts from Lake Billy Chinook in support of the anadromous fish reintroduction goal.  (*Id*.) The WQMMP notes that because the SWW has the potential to affect water quality and fish passage, all possible impacts must be considered in the operation of the SWW, which should be adaptively managed pursuant to the WQMMP.  (*Id*.)

After issuance of the 2005 License, PGE and the Tribe constructed the SWW, which is located within the boundary of the Reservation.  (Calica Dec. ¶ 35.)  The cost of construction of the SWW was approximately $110 million.  (*Id*.)  The SWW has been in operation since 2009, and anadromous fish are now passing upstream and downstream through the Project for the first time since the 1960s.  (*Id*.)  An achievement that is viewed as remarkable by Tribal leaders.  (*Id*.)

---

[2]     The Explanatory Statement describe the SWW as the "centerpiece of the resource protection measures" to be implemented pursuant to the 2005 License.

Page 13 -   THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF
           OREGON'S MOTION TO DISMISS

### III.    The Subject of This Action.

On August 18, 2016, DRA commenced this action against PGE pursuant to the citizen suit provision of the Clean Water Act ("Act"), 33 U.S.C. § 1365.  (ECF Dkt. 1.)  DRA alleges that PGE is responsible for the day-to-day operations of the Pelton Project, including the SWW.  (*Id.*)  DRA alleges that PGE is in violation of DEQ's water quality certification for the Project.  (*Id.*)  In particular, DRA alleges that PGE's operation of the SWW results in violations of DEQ's water certification relating to the following water quality criteria: temperature, dissolved oxygen, and pH.  (*Id.*)  DRA seeks declaratory relief, mandatory injunctive relief, and an award of costs, including attorney fees.  (*Id.*)  While not entirely clear, it appears to the Tribe that DRA intends to seek a mandatory injunction that requires PGE to discharge bottom water in a fashion similar to the original license period.  *See* Declarations of John Hazel, Amy Hazel, Greg McMillan, Richard Haefle, and Steve Prybl (ECF Dkts. 67 – 71).

### IV.    Argument.

#### A.    Legal Standard For Rule 12(b)(7) Motion.

Rule 12(b)(7) authorizes dismissal of an action for failure to join a party required to be joined by Rule 19.  In determining whether a party is required to be joined, Rule 19 imposes the following three-step inquiry:

1.    Is the absent party necessary under Rule 19(a)?

2.    If so, is it feasible to order the absent party to be joined?

3.    If joinder is not feasible, can the case proceed without the absent party, or is the absent party indispensable such that the action must be dismissed pursuant to Rule 19(b)?

*Salt River Project Agr. Imp. and Power Dist. v. Lee*, 672 F.3d 1176, 1179 (9th Cir. 2012) (citing *EEOC v. Peabody W. Coal Co.,* 400 F.3d 774, 779-80 (9th Cir. 2005)).  The inquiry is practical, fact specific, and designed to avoid the harsh results of rigid application.  *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990).

The Tribe is a necessary party because it claims an interest relating to the subject of the action and because the Tribe is so situated that proceeding with the action in its absence would, as a practical matter, impair or impede the Tribe's ability to protect its sovereign and proprietary interests.  Fed. R. Civ. P. 19(a)(1)(B)(i).[3]  It is not feasible to join the Tribe because of sovereign immunity.  *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978) (Indian tribes enjoy sovereign immunity and may not be sued without unequivocal waiver or Congressional abrogation).  The case cannot in equity and good conscience proceed without the Tribe and must be dismissed.  *See Dewberry v. Kulongoski*, 406 F.Supp.2d 1136, 1148 (D. Or. 2005) (balancing factors and determining that case could not proceed in equity and good conscience without absent tribe).

**B.     The Tribe Has Profound Sovereign and Proprietary Interests That Are Legally Protected and Relate to the Subject of the Action.**

To determine whether the Tribe is a necessary party under Rule 19(a)(1)(B)(i), the Court must first determine whether the Tribe claims an interest relating to the subject of the action, which the Ninth Circuit has determined to be a "legally protected interest."  *Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California*, 547 F.3d 962, 970 (9th Cir. 2008);

---

[3]     The Tribe expressly reserves its right to assert that it is also a necessary party pursuant to Rule 19(a)(1)(A) if additional allegations and assertions made and relief requested in this action demonstrate that complete relief cannot be accorded among the parties in the Tribe's absence.

Page 15 -   THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON'S MOTION TO DISMISS

*Union Pacific Railroad Company v. Runyon*, 320 F.R.D. 245, 250 (D. Or. 2017) (citing *Cachil*).

There are few categorical rules as to what constitutes an interest in the pending litigation that is

legally protected. *Id.*  The interest need not be property in the sense of the due process clause,

but the interest must be more than a financial stake and more than speculation about a future

event. *Id.*

The subject of this action is DRA's contention that PGE is operating the Project,

specifically the SWW, in violation of DEQ's water quality certification.  The Tribe has vast

legally protected interests that relate to the subject of DRA's action.  (Calica Dec. ¶¶ 36 – 37.)

Those protectable interests can properly be divided into proprietary interests and sovereign

interests.

The Tribe's proprietary interests include: co-ownership of the Project, joint licensee of

the 2005 License, which includes DEQ's water quality certification, party to the GSA, and party

to the Relicensing Settlement Agreement.  The Tribe's substantial interests in the GSA and the

Relicensing Settlement Agreement are protectable interests for purposes of Rule 19.

*See Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1023 (9th Cir. 2002) (substantial

interest arising from compact protectable for purposes of Rule 19).  Moreover, the Tribe's co-

ownership of the Project and its appurtenances and the Tribe's interest as joint licensee in the

2005 License are protectable property rights in the due process sense.  *See Harris v. County of*

*Riverside*, 904 F.2d 497, 503 (9th Cir. 1990) (landowner has a due process protected right to

devote land to any legitimate use, and such use and enjoyment cannot be deprived without due

process); *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1031-33 (9th Cir. 2012) (due process is

afforded to ownership of personal property); *Industrial Safety Equipment Ass'n, Inc. v. E.P.A.*,

Page 16 -    THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF
              OREGON'S MOTION TO DISMISS

656 F.Supp. 852, 856 *affirmed* 837 F.2d 1115 (D. Col. 1987) (agency license protectable

property interest for purposes of due process); *James C. Katsekas and Zoes J. Dimos*,

24 F.E.R.C. ¶ 61,028 (1983) (recognizing due process rights inherent in FERC license). Thus,

the Tribe's property rights that are subject to due process and that relate to the subject of the

action are protectable interests for purposes Rule 19(a). *See Cachil*, 547 F.3d at 970

(recognizing that property in the due process sense is a protectable interest under Rule 19(a)).

The Tribe's sovereign interests relate to sovereign authority to regulate activities within

the boundaries of the Reservation and the natural resources of the Deschutes River basin,

including the fish resources of the lower Deschutes River. The Tribe's sovereign interests also

include its protection of its treaty-reserved rights, including the right to take fish at its usual and

accustomed stations throughout the Deschutes River Basin. Those interests derive directly from

the 1855 Treaty and are legally protectable interests for purposes of Rule 19(a). *See Washington*

*v. Daley*, 173 F.3d 1158, 1167 (1999) (absent tribe's claim of interest in protecting treaty rights

is a legally sufficient interest). For the foregoing reasons, the Tribe's sovereign and propriety

interests relate to the subject of the action and are protectable under Rule 19(a).

### C.    Proceeding with the Action in the Tribe's Absence would, as a Practical Matter, Impair or Impede its Ability to Protect its Sovereign and Proprietary Interests That Relate to the Subject of this Action.

Because the Tribe has legally protectable interests that relate to the subject to the action,

the Court must next determine whether the Tribe's ability to protect its interests will be impaired

or impeded if the action proceeds without joinder. *Runyon*, 320 F.R.D. at 251-52. The Court

should focus on whether the Tribe's interests are adequately represented by the parties to the

action. *Id.* In making the determination, the Ninth Circuit applies three factors:

Page 17 -    THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON'S MOTION TO DISMISS

1.   Whether the interests of a present party to the suit are such that it will undoubtedly make all of the absent party's arguments;

2.   Whether a present party is capable and willing to make such arguments; and

3.   Whether the absent party would offer any necessary element to the proceedings that the present parties would neglect.

*Id.* (citing *Shermoen v. U.S.*, 982 F.2d 1312, 1317 (9th Cir. 1992)).  Applying each of those factors reveals that PGE cannot adequately represent the Tribe's propriety and sovereign interests that relate to this action.

PGE is a private, investor-owned utility company; it is not a federally-recognized sovereign Indian tribe that is a party to a treaty with the United States.  Even if it were willing to do so, PGE simply does not have the institutional capacity to make all of the Tribe's arguments in defending against DRA's claim.  Moreover, PGE does not have the Tribe's authorization to represent all of the Tribe interests in this action.  (Calica Dec. ¶ 40.)  PGE cannot give voice to the Tribe's sovereign (including treaty-reserved) interests that are undeniably implicated in this action.  (*Id.*)

Even though it is operator of the Project, except for the Regulating Dam's generating facilities, PGE cannot make all of the Tribe's arguments in the Tribe's capacity as co-owner of the Project.  Any change that increases the cost of Project operations will impact the Tribe differently than PGE.  Unlike PGE, the Tribe is not regulated by the PUC. (Calica Dec. ¶ 22 n 1.)  The Tribe's share of any increase in cost of operation of the Project as a result of this would be borne solely by the Tribe and its members, unlike PGE, whose share of the increased cost may be covered by its rate payers.  Given the Tribe's high unemployment and

poverty, if this action were to proceed, it would be imperative that the Court be able to hear from the Tribe directly as to how its share of the Project revenues could be impacted by this action.

The Tribe is the only party in a position to give voice to its sovereign (including treaty-reserved) and proprietary interests implicated by this action.  No other party is capable of making all of the Tribe's arguments in defense of its interests.  The Tribe would offer necessary elements to this action that the present parties would neglect simply because they cannot make the Tribe's arguments in defense of the Tribe's interests.  Proceeding with the action in the Tribe's absence would therefore, as a practical matter, impair or impede its ability to protect its sovereign and proprietary interests that relate to the subject of this action for purposes of Rule 19(a)(1)(B)(i).

### D.    The Tribe Cannot Be Joined Because of Sovereign Immunity.

Indian tribes possess common law immunity from suit.  *Santa Clara Pueblo*, 436 U.S. at 58 (1978).  Indian tribes cannot be compelled to join a federal action unless the tribe unequivocally waives sovereign immunity, *id.*, or Congress expressly abrogates the tribe's immunity from suit.  *See Dewberry*, 406 F.Supp.2d at 1145 (citing *Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 754, 760 (1998); *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 509 (1991)).

The Tribe has not waived its sovereign immunity for purposes of this action.  (Calica Dec. ¶ 41.)  The Tribe is aware of no express abrogation of their sovereign immunity by Congress in these circumstances.  (*Id.*)  The Tribe cannot be compelled to join this action, *i.e.*, joinder is not feasible under Rule 19(a).

Page 19 -    THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF
          OREGON'S MOTION TO DISMISS

**E.      The Case Cannot in Equity and Good Conscience Proceed Without the Tribe and Must Be Dismissed.**

In determining whether, in equity and good conscience, a case may proceed without the absent party or whether the absent party is indispensable such that the action must be dismissed, a court must consider: (1) prejudice to the parties, including the absent party; (2) whether relief can be tailored to lessen the prejudice; (3) whether an adequate remedy can be awarded without the absent party; and (4) whether there exists an alternative forum.[4] *Dewberry*, 406 F.Supp.2d at 1148. The Rule 19(b) factors demonstrate that this case cannot proceed "in equity and good conscience" without the Tribe. Fed. R. Civ. P. 19(b).

The first factor requires consideration of the potential prejudice to both the absent party and the existing parties. *Runyon*, 320 F.R.D. at 254. In so far as it is focused on the absent party, the Ninth Circuit has determined that this factor largely duplicates the consideration that made a party necessary under Rule 19(a). *Am Greyhound Racing, Inc.* 305 F.3d at 1026. As set forth in Sections IV. B. and C. of this memorandum, the Tribe has demonstrated that it has profound sovereign and proprietary interests that are legally protected and relate to the subject of the action. The Tribe has also shown that proceeding with the action in its absence would impair or impede the Tribe's ability to protect its interests. This factor weighs in favor of dismissal.

The second factor centers on whether the Court can tailor relief to lessen the prejudice to the absent party. *Id.* The future operation of the Pelton Project, specifically as it relates to

---

[4]     While the Ninth Circuit consistently applies the Rule 19(b) factors under these circumstances, it has observed that some courts take the position that "when a necessary party is immune from suit, there is very little need for balancing Rule 19(b) factors because immunity itself may be viewed as the compelling factor." *Confederated Tribes of the Chehalis Indian Reservation v. Lujan*, 928 F.2d 1496, 1499 (9th Cir. 1991).

Page 20 -   THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON'S MOTION TO DISMISS

discharging water into the lower Deschutes River, is central to action.  Any relief that changes the operation of the Project will necessarily affect the Tribe's sovereign and proprietary interests. The Tribe is not aware of any practical way to shape relief so as to avoid impairment of the Tribe's protectable interests.  This factor thus weighs in favor of dismissal.

The third factor also favors dismissal because any judgment against PGE ordering a change in operation of the Pelton Project will impair the Tribe's protectable interests. *See id.* at 1025.  Any such judgment may also trigger re-initiation of consultation with NMFS and USFWS with the attendant risk of termination or modification of the incidental take authorization that both agencies have issued for the Project.[5]

As to the fourth factor, the Ninth Circuit has regularly held that a tribal interest in immunity overcomes the lack of an alternative remedy or forum for the plaintiff.  *Id.* (citing *Dawavendewa v. Salt River Project Agr. Im. & Power Dist.*, 276 F.3d 1150, 1162 (9th Cir. 2002)).  DRA, however, appears to have an alternative forum at FERC if this action is dismissed. *See generally* 16 U.S.C. §§ 825e *et seq.*; 18 C.F.R. Part 385 (rules of practice and procedure). This factor weighs in favor of dismissal.

DRA's "strategic maneuvering" should also be taken into account when considering whether in equity and good conscience this action should be dismissed.  *See Runyon*, 320 F.R.D. at 255.  DRA seeks declaratory and injunctive relief, both of which require the Court to exercise its equitable authority, relating to the operation of the Pelton Project.  *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (declaratory relief is discretionary); *Winter v. Natural Res. Def.*

---

[5]       There is a possibility that both NMFS and USFWS are required parties to this action.

Page 21 -   THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF
             OREGON'S MOTION TO DISMISS

*Council, Inc.*, 555 U.S. 7, 22 (2008) (setting forth standards for permanent injunctive relief).

From the beginning, DRA has sought to strategically posture this case as DRA versus PGE

alone.  In so doing, DRA ignored (and continues to ignore) the very real and substantial interests

of the Tribe that are implicated by this action.  The Court record manifests that DRA's ignorance

is more akin to willful blindness than an honest failure to apprehend the Tribe's interests.

DRA's efforts to ignore the Tribe appear to have constrained DRA's ability to accurately and

fully portray the history of the Project and its impact on water quality and the fish resources of

the Deschutes River.  (Calica Dec. ¶¶ 38 – 39.)  While there may be no rule against such

maneuvering, the Tribe believes that it can and should be taken into consideration as the Court

determines whether this case can proceed in equity and good conscience or should be dismissed.

From the Tribe's perspective, the balance of the equities weigh heavily in favor of dismissal.[6]

## V.    Conclusion.

For the foregoing reasons, the Tribe is a necessary party because proceeding with the

action would, as a practical matter, impair or impede the Tribe's ability to protect its sovereign

and propriety interests that relate to the subject of this action.  The Tribe's inherent sovereign

immunity preclude its joinder, and the case cannot in equity and good conscience proceed

without the Tribe. The Tribe's motion to dismiss should be granted, and this action should be

dismissed with prejudice.

---

[6]      The Tribe anticipates that DRA may attempt to argue that the Tribe's amicus status is
sufficient to protect its interests or that the Tribe may intervene to protect its interests.  The
Ninth Circuit has rejected both as appropriate means to lessen to prejudice to an absent Indian
tribe. *See Makah*, 910 F.2d at 560.

Page 22 -   THE CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF
               OREGON'S MOTION TO DISMISS

Respectfully submitted.


Dated: March 21, 2018                          s/ Josh Newton
                                               Josh Newton, OSB 983087
                                               Attorney for The Confederated Tribes
                                               of the Warm Springs Reservation of Oregon

CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2018, I filed a true and correct copy of the foregoing

document with the Clerk of the Court for the United States District Court – District of Oregon

via the CM/ECF system.  Participants in this case who are registered CM/ECF users will be

served by the CM/ECF system.

KARNOPP PETERSEN LLP

s/ Josh Newton
Josh Newton, OSB 983087
Attorney for The Confederated Tribes of the
Warm Springs Reservation of Oregon

CERTIFICATE OF SERVICE