# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **DESCHUTES RIVER ALLIANCE**, | Case No. 3:16-cv-1644-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **PORTLAND GENERAL ELECTRIC COMPANY**, | |
| Defendant. | |

Daniel M. Galpern, LAW OFFICE OF DANIEL M. GALPERN, 2495 Hilyard Street, Suite A, Eugene, OR, 97405; J. Douglas Quirke, OREGON CLEAN WATER ACTION PROJECT, P.O. Box 11501, Eugene, OR, 97440; Jonah Sandford, 7748 N. Willamette Blvd, Portland, OR, 97203. Of Attorneys for Plaintiff.

Michael R. Campbell, STOEL RIVES LLP, 760 S.W. Ninth Ave, Suite 3000, Portland, OR 97205; Beth S. Ginsberg, STOEL RIVES LLP, 600 University Street, Suite 3600, Seattle, WA, 98101. Of Attorneys for Defendant.

Anika E. Marriott, G. Frank Hammod, and Scott J. Kaplan, OREGON DEPARTMENT OF JUSTICE, 1162 Court Street NE, Salem, OR, 97301. Of Attorneys for Amicus Oregon Department of Environmental Quality.

Josh Newton and Benjamin C. Seiken, KARNOPP PETERSEN LLP, 360 Bond Street, Suite 400, Bend, OR , 97702. Of Attorneys for Amicus Confederated Tribes of the Warm Springs Reservation of Oregon.

**Michael H. Simon, District Judge.**

Plaintiff Deschutes River Alliance ("DRA") is a nonprofit corporation made up of individuals residing throughout Oregon who use, enjoy, and recreate in the Deschutes River and its tributaries in the vicinity of the Pelton Round Butte Hydroelectric Project ("Pelton Project" or "Project"). Defendant Portland General Electric Company ("PGE") is part-owner and part-operator of the Pelton Project. DRA sues PGE, alleging that its operation of the Pelton Project violates the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (commonly known as the Clean Water Act ("CWA")). DRA's suit arises under Section 505(a)(1) of the CWA, codified at 33 U.S.C. § 1365(a)(1), commonly known as a citizen suit provision. The Confederated Tribes of the Warm Springs Reservation of Oregon (the "Tribe"), which consists of three Indian tribal groups—the Warm Springs, the Wasco, and the Paiute—serves as amicus curiae in this case. Both PGE and the Tribe move to dismiss DRA's Complaint under Federal Rule of Civil Procedure 12(b)(7) for failure to join a necessary party (*i.e.*, the Tribe) under Rule 19. For the reasons discussed, the Tribe and PGE's motions are denied. Because the Court concludes, however, that the Tribe is a necessary party to this litigation, and that the Clean Water Act abrogates the Tire's sovereign immunity on those issues, the Court orders the Tribe formally joined.

## BACKGROUND

The Pelton Project consists of three dams on the Deschutes River: the Round Butte Dam, the Pelton Dam, and the Reregulating Dam. ECF 73 at 4, ¶ 11. The Pelton Project is situated in Jefferson County, Oregon, within and adjacent to the Warm Springs Indian Reservation (the "Reservation"). ECF 73 at 3, ¶ 6; 93 F.E.R.C. ¶ 61183. Pursuant to a treaty executed on June 25, 1855 ("1855 Treaty"), between the United States and the Tribes and Bands of Middle Oregon, the Reservation is reserved for the exclusive use of, and serves as a permanent

homeland to, the Tribe, which is the legal successor in interest to the Indian signatories to the 1855 Treaty. ECF 73 at 2-3, ¶¶ 4, 6.

In 1951, the Federal Power Commission ("FPC"), predecessor to the Federal Energy Regulatory Commission ("FERC"), issued to PGE a 50-year license for the Pelton Project, authorizing the construction of the Pelton and Reregulating Dams. *Id*. at ¶ 12. In 1960, the FPC amended the license to authorize PGE to construct the Round Butte Dam. *Id*. at ¶ 12. PGE and the Tribe later filed a joint application with FERC to amend the Pelton Project license to allow the Tribe to construct power generation facilities in the Reregulating Dam. *Id*. FERC granted this application and in 1980 amended the license to designate PGE and the Tribe as joint licensees for the Pelton Project. *Id*. at ¶ 16.

In April 2000, PGE, the Tribe, and the United States Department of Interior entered into a Long-Term Global Settlement and Compensation Agreement ("GSA"). *Id*. at ¶ 20. Through the GSA, the Tribe and PGE established an Ownership and Operation Agreement for the Pelton and Round Butte Dams and Generating Facilities ("O&O Agreement"), which is still in effect. *Id*. at ¶ 21; Transcript of Oral Argument Proceedings May 9, 2018 ("Transcript") at 20. The O&O Agreement designates PGE as the operator of the Pelton and Round Butte facilities, and of the Reregulating Dam. Transcript at 33. The Tribe, however, is operator of the *generation facilities* at the Reregulating Dam. ECF 73 at ¶ 20; Transcript at 33. The GSA also obligates PGE to compensate the Tribe for the Pelton Project's use and occupation of lands within the Reservation, including by selling the Tribe up to a 50.01 undivided interest in PGE's Pelton Project assets over time. ECF 73 at ¶ 20; Portland Gen. Elec. Co. & the Confederated Tribes of the Warm Springs Reservation of Oregon, 93 FERC ¶ 61183, 61602 (Nov. 21, 2000). The GSA was approved by FERC and the Oregon Public Utility Commission and ratified by Congress. *See*

*In Re Portland Gen. Elec. Co.*, Order No. 00-459, 2000 WL 1504844 (Aug. 22, 2000); 93 F.E.R.C. ¶ 61,183 (2000); PL 107-102, December 27, 2001, 115 Stat 974.

In June 2001, PGE and the Tribe jointly applied for a new FERC project license. ECF 73 at ¶ 23. The Tribe and PGE simultaneously filed applications for water quality certifications for the Pelton Project, pursuant to CWA Section 401, with both the Tribe's Water Control Board ("WCB") and with Oregon's Department of Environmental Quality ("DEQ"). *Id*. In June 2002, WCB and DEQ issued their respective water quality certifications. Each certification incorporates a Water Quality Management and Monitoring Plan ("WQMMP"), which was intended to provide a coordinated way to apply both certifications to the Project. *Id*. at ¶ 24.

Beginning in January 2003, PGE and the Tribe participated in a facilitated Settlement Working Group with various governmental and non-governmental stakeholders to resolve issues associated with the relicensing of the Pelton Project. *Id*. at ¶ 25. The Settlement Working Group produced a Settlement Agreement Concerning the Relicensing of the Pelton Round Butte Hydroelectric Project FERC Project 2030 ("Relicensing Settlement Agreement"). *Id*.; ECF 73-7.

In July 2004, the Tribe and PGE submitted the Relicensing Settlement Agreement to FERC for approval, along with an Offer of Settlement and Joint Explanatory Statement and Request for Technical Conference ("Explanatory Statement"). ECF 75-2. On June 21, 2005, FERC approved the settlement and issued a new license to PGE and the Tribe as joint licensees of the Pelton Project for a 50-year period. ("2005 License"). 111 FERC ¶ 61,450 (2005). The 2005 License incorporates most of the proposed license articles contained in the Relicensing Settlement Agreement, and the DEQ water quality certification. *Id*.

During the original license term, the Pelton Project did not meet all of the water quality standards in the Deschutes River immediately below the Pelton Project dams. ECF 73 at ¶ 24. At

the time of the relicensing negotiations, the Project withdrew and discharged water from the bottom of the reservoir only, which resulted in the project exceeding water quality standards for temperature, pH, and dissolved oxygen. ECF 75-2 at 4-5. The Project, from the beginning, also had issues with fish passage. The dams created a total barrier to migration by resident and anadromous fish in the Deschutes River, preventing anadromous and resident salmonids from reaching historical spawning and rearing areas. ECF 75-2 at 4. By 1973, fish passage was abandoned in favor of a fish hatchery, a result that has had a profound effect on the Tribe. ECF 73 at ¶ 26. Under the 2005 License, the Tribe and PGE were required to (1) reintroduce anadromous fish runs upstream of the Pelton Project that were extirpated as a result of construction and operation of the project; and (2) reduce the Pelton Project's contribution to water quality problems on the Lower Deschutes River. ECF 75-3. A key feature of the Relicensing Settlement Agreement, made a part of the 2005 License, is a Fish Passage Plan. ECF 73 at ¶ 30.

Under the 2005 License, the main way in which the Project would move toward improving both fish passage and water quality was by construction of a selective water withdrawal facility ("SWW") at the Round Butte Dam intake tower. *Id*. at ¶ 34. The SWW has been in operation since 2009. *Id*. at ¶ 35. The SWW is designed to allow water withdrawal from both the warmer surface water and the cooler bottom water, which both helps to meet temperature and water quality goals and standards and to allow fish passage. ECF 75-3. As a result of the SWW, anadromous fish are now passing both upstream and downstream through the Pelton Project.

The 2005 License also establishes Implementation Committees—a component of the Relicensing Settlement Agreement—including a Fish Committee. *Id*. at ¶ 31. The Fish

Committee consists of PGE and the Tribe as well as several other stakeholders. The Fish Committee oversees implementation of the Fish Passage Plan. ECF 75-2 at 16. FERC intended the Fish Committee "to have a pivotal role in the administration of a large variety of post-licensing activities, including changes in protection and enhancement measures on behalf of fish and wildlife, water quality, and recreation." ECF 75-1 at 7.

DRA brings this action under the citizen suit provision of the Clean Water Act, alleging ongoing violations of the Pelton Project's CWA § 401 Certification from DEQ, which is a condition of the 2005 License. Specifically, DRA alleges that PGE has violated the following conditions of the DEQ Water Quality Certification: (1) Condition E.1, requiring that the facility be operated in accordance with the pH Management Plan contained in the WQMMP; (2) Condition C.1, requiring that the SWW facility be operated in accordance with the Temperature Management Plan; and (3) Condition S, which requires that no wastes be discharged and no activities conducted that would violate state water quality standards. The Tribe and PGE both move to dismiss under Rule 12(b)(7) for failure to join the Tribe, a party that the Tribe and PGE argue is necessary under Rule 19.

DISCUSSION

**A.  Procedural Issues**

**1.  Whether the Tribe Properly Can Move to Dismiss**

DRA argues first that neither the Tribe nor PGE is authorized under the Federal Rules of Civil Procedure to bring a 12(b)(7) motion at this time. DRA argues that the Tribe, which is not a party to this case, may not bring such a motion under Rule 12(b)(7), which provides that "a *party* may assert" a 12(b)(7) defense. Fed. R. Civ. P. 12(b)(7). The Tribe suggests in response that it is a *type* of party, although it does not have "full party status." The Tribe argues that, because Rule 12(b)(7) does not limit the *types* of parties that may assert a 12(b)(7) defense, it does not

clearly proscribe the Tribe from bringing such a motion. The Tribe also argues that Rule 12 should, for practical purposes, be construed to permit an amicus curiae party to file a Rule 12(b)(7) motion.

Under Rule 12, only a *party* may make a Rule 12(b)(7) motion to dismiss. "An amicus curiae is not a party to litigation." *Miller-Wohl Co. v. Comm'r of Labor & Indus. State of Mont.*, 694 F.2d 203, 204 (9th Cir. 1982) (responding to amici curiae's contention "that their extensive participation [in a case had] made them parties to th[e] litigation"). The basis of the Tribe's motion is that the Tribe *was not joined as a party* to this case. The Tribe's motion to dismiss is therefore denied. Nonetheless, PGE, the defendant in this case, has made its own motion to dismiss pursuant to Rules 12(b)(7) and 19, and has joined in the Tribe's motion to dismiss. The Court therefore considers PGE's motion to dismiss, with the benefit of the Tribe's arguments as amicus curiae.

### 2. Whether PGE's Motion is Timely

DRA also argues that PGE's motion under Rule 12(b)(7) is untimely. "Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under [Rule 12] must not make another motion under [Rule 12] raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). PGE previously filed a motion to dismiss under Rule 12(b)(1), asserting a lack of subject-matter jurisdiction. Rule 12(h)(2) provides that the failure to join a required party may nonetheless be raised: "in any pleading allowed or ordered under Rule 7(a)" (*i.e.*, a complaint); "by a motion under Rule 12(c)" (*i.e.*, a motion for judgment on the pleadings); or" "at trial." Rule 12(h)(3) relates to subject-matter jurisdiction.

Because Rule 12(h)(2) provides that the defense of failure "to join a person required by Rule 19(b) . . . may be raised as a motion for judgment on the pleadings, and may be made as

late as at trial, it is in the interest of judicial economy to hear PGE's motion to dismiss at this

stage. *See Moretti v. The Hertz Corp.*, 2016 WL 1238712, at *4 (D. Del. Mar. 29, 2016)

("[B]ecause Defendants may raise the merits of their Rule 12(b)(7) defense in a later pleading, to

promote judicial efficiency the Court will proceed to address them."). Further, "[a] court with

proper jurisdiction may also consider *sua sponte* the absence of a required person and dismiss for

failure to join." *Republic of Philippines v. Pimentel*, 553 U.S. 851, 861 (2008). The Court

therefore addresses PGE's motion on its merits. *See Jaffer v. Standard Chartered Bank*, 301

F.R.D. 256, 260 (N.D. Tex. 2014) ("[E]ven though [a defendant's] 12(b)(7) motion to dismiss is

procedurally barred, the court will *sua sponte* raise the issue and determine whether Standard

Ghana is an indispensable party that cannot be joined, warranting dismissal of this case.").

## B.  Merits of PGE's Motion to Dismiss

In determining whether a case should be dismissed under Rule 19 for failure to join a

party, the Court follows a three-step inquiry:

> 1. Is the absent party necessary (*i.e.*, required to be joined if
> feasible) under Rule 19(a)?
>
> 2. If so, is it feasible to order that the absent party be joined?
>
> 3. If joinder is not feasible, can the case proceed without the absent
> party, or is the absent party indispensable such that the action must
> be dismissed?

*Salt River Project Agr. Imp. & Power Dist. v. Lee*, 672 F.3d 1176, 1179 (9th Cir. 2012) (citing

*EEOC v. Peabody W. Coal Co.,* 400 F.3d 774, 779-80 (9th Cir. 2005)). This "inquiry is a

practical one and fact specific, and is designed to avoid the harsh results of rigid application."

*Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990) (citations omitted).

### 1.  Whether the Tribe is Necessary

As the Ninth Circuit has explained:

> A party may be necessary under Rule 19(a) in three different ways.
> First, a person is necessary if, in his absence, the court cannot
> accord complete relief among existing parties. *See* Fed.R.Civ.P.
> 19(a)(1)(A). Second, a person is necessary if he has an interest in
> the action and resolving the action in his absence may as a
> practical matter impair or impede his ability to protect that
> interest. *See* Fed.R.Civ.P. 19(a)(1)(B)(i). Third, a person is
> necessary if he has an interest in the action and resolving the action
> in his absence may leave an existing party subject to inconsistent
> obligations because of that interest. *See* Fed.R.Civ.P.
> 19(a)(1)(B)(ii).

*Salt River Project Agr. Imp.*, 672 F.3d at 1179. Here, the Tribe and PGE argue that the Tribe is

necessary because it claims an interest relating to the subject of the action and proceeding in the

Tribe's absence would impair or impede the Tribe's ability to protect that interest.

### a. Does the Tribe Have a Legally Protected Interest

An interest in the action, for purposes of Rule 19, means an interest that is "legally

protected." *Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California*, 547

F.3d 962, 970 (9th Cir. 2008). This "determination is heavily influenced by the facts and

circumstances of each case." *Bakia v. County of Los Angeles*, 687 F.2d 299, 301 (9th Cir. 1982).

There are "few categorical rules" that inform this inquiry. *Cachil*, 547 F.3d at 970; *see also Ward

v. Apple Inc.*, 791 F.3d 1041, 1051 (9th Cir. 2015) ("We have offered little guidance regarding

which interests warrant legal protection under Rule 19."). On the one hand, the Ninth Circuit has

"held that the interest at stake need not be 'property in the sense of the due process clause.'"

*Cachil*, 547 F.3d at 970 (quoting *Am. Greyhound Racing v. Hull*, 305 F.3d 1015, 1023 (9th

Cir. 2002)). On the other, the Ninth Circuit has "recognized that the 'interest must be more than a

financial stake, and more than speculation about a future event.'" *Id.* at 970 (quoting *Makah*, 910

F.2d at 558). "Within the wide boundaries set by these general principles," the inquiry is

"practical and fact-specific." *Ward*, 791 F.3d at 1051 (quotation marks omitted).

The Tribe argues that it has both proprietary and sovereign interests in the subject of the action. The Tribe alleges that its proprietary interests include is status as: co-owner of the Pelton Project, joint licensee of the 2005 License, party to the GSA, and party to the Relicensing Settlement Agreement. The Tribe's sovereign interests, it explains, are related to its authority to regulate activities and resources within the boundaries of its Reservation, and to its treaty-reserved rights, including the right to take fish at its usual and accustomed stations throughout the Deschutes River Basin. DRA acknowledges that the Tribe holds essential interests related to the Pelton Project, the Deschutes River Basin's fish and wildlife and water quality, and to its own sovereignty. DRA argues, however, that those broad interests are not implicated in this case, which deals only with the issue of whether PGE is operating the Pelton Project in violation of DEQ's Water Quality Certification.

DRA's attempt to narrow the scope of this case is unpersuasive. This lawsuit arises out of DRA's assertion that the Pelton Project is being operated in violation of the CWA. The Tribe and PGE are co-licensees of the Pelton Project. Additionally, although under the O&O Agreement between the Tribe and PGE, PGE is the operator of the Round Butte and Pelton Dams, and of certain aspects of the Reregulating Dam, the Tribe holds an ownership interest in the entirety of the Pelton Project, and serves as operator of the generation facilities at the Reregulating Dam. Furthermore, the operation of the Pelton Project has a direct effect on the Tribe's treaty-reserved rights, including not only its right to dictate how its land is used and how facilities within its boundaries are operated, but also the Tribe's right to the resources, including fish, within the Deschutes River Basin. The Tribe thus has an interest in the subject matter of this action, and that interest is legally protected by both the Tribe's ownership of and license for the Pelton Project and by the 1855 Treaty.

### b.   Would Proceeding Without Tribe Impair Its Interest

"If a legally protected interest exists, the court must further determine whether that

interest will be *impaired* or *impeded* by the suit." *Shermoen v. United States*, 982

F.2d 1312, 1318 (9th Cir. 1992) (quoting *Makah*, 910 F.2d at 558 (emphasis in original)).

Resolving the question of whether the Pelton Project is being operated in violation of the DEQ

Water Quality Certification could impair the Tribe's interest as co-operator and co-licensee of

the Pelton Project. Additionally, any relief ordered would inevitably impact, or at least carry a

risk of impacting, the Tribe's interests in the resources of the Deschutes River Basin. Regardless

of the precise relief requested or ultimately ordered, any relief that involves changing the pH,

oxygen, or temperature levels of the water in and around the Pelton Project—the very measures

DRA seeks to affect through this lawsuit—will impair the Tribe's sovereign interest in

exercising governmental power over the natural resources within the Reservation and risk

impairing the Tribe's right to fish in and around the Deschutes River Basin.

DRA argues that PGE can adequately represent the Tribe's interests in the suit. The

impairment of an absent party's interests "may be minimized if the absent party is adequately

represented in the suit." *Shermoen*, 982 F.2d at 1318 (quoting *Makah*, 910 F.3d at 558).

> A non-party is adequately represented by existing parties if: (1) the
> interests of the existing parties are such that they would
> undoubtedly make all of the non-party's arguments; (2) the existing
> parties are capable of and willing to make such arguments; and (3)
> the non-party would offer no necessary element to the proceeding
> that existing parties would neglect.

*Sw. Ctr. for Biological Diversity v. Babbitt*, 150 F.3d 1152, 1153-54 (9th Cir. 1998).

The Tribe and PGE argue that PGE, a private corporation tasked with providing its

customers with power, cannot adequately represent the interests of the Tribe, a sovereign entity.

DRA argues that although the interests of the Tribe and PGE may derive from different sources,

the Tribe and PGE share the same interest in defending the specific claims alleged in DRA's complaint—namely, that the operation of the Pelton Project violates the CWA.

Although DRA may be correct that, in resolving the *merits* of this case, PGE would likely make all of the same arguments that the Tribe would make if it were formally named a defendant, the same is not true with respect to the fashioning of a *remedy*. The Tribe has unique interests in not only the operation of the Pelton Project, but also in its effect on the surrounding natural resources. Those interests are reserved by treaty and would not adequately be represented by PGE. A remedy ordered by the Court against PGE could also result in requiring the Tribe—a sovereign entity—to take or refrain from taking certain actions. To find liability in the absence of the Tribe, and thereafter to fashion a remedy in the Tribe's absence, has the potential significantly to impair the Tribe's interest in a manner substantially different from any effect on PGE's interests.

For similar reasons, PGE is not *capable* of making all of the arguments that the Tribe would make. The Tribe has also expressed that it vests no authority in PGE to make the Tribe's arguments, indicating that PGE may be not only unable, but unwilling, to make the arguments available to the Tribe. Finally, the Tribe will offer necessary elements for the Court's consideration, such as how to interpret the DEQ certification in light of the parallel WCB certification, and how to go about fashioning a remedy in a way that does not unnecessarily impinge on the Tribe's treaty-protected interests.

### 2.   Whether it is Feasible to Join the Tribe

The Tribe and PGE argue that sovereign immunity bars the Tribe from being joined. "Federally recognized Indian tribes enjoy sovereign immunity from suit, and may not be sued absent an express and unequivocal waiver of immunity by the tribe or abrogation of tribal immunity by Congress." *Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276

F.3d 1150, 1159 (9th Cir. 2002) (citations omitted). No party argues that the Tribe has waived its immunity in this case. The question for the Court, therefore, is whether Congress has abrogated tribal sovereign immunity for citizen suits under the CWA.

"Indian tribes are domestic dependent nations that exercise inherent sovereign authority." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2030 (2014) (quotation marks omitted). "Among the core aspects of sovereignty that tribes possess—subject, again, to congressional action—is the common-law immunity from suit traditionally enjoyed by sovereign powers." *Id.* (quotation marks omitted). "Although Congress has plenary authority over tribes, courts will not lightly assume that Congress in fact intends to undermine Indian self-government." *Id.* at 2032. "To abrogate tribal immunity, Congress must 'unequivocally' express that purpose." *C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411, 418 (2001) (quoting *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58 (1978)). "[T]he standard principles of statutory construction do not have their usual force in cases involving Indian law." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). A primary "cannon[] of construction applicable in Indian law" is that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Id.*

The CWA citizen suit provision authorizes civil actions "against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter . . ." 33 U.S.C. 1365(a).

The Tribe and PGE argue, first, that the CWA does not abrogate tribal sovereign immunity because it creates a right to sue only a person who is "alleged to be in violation" of the CWA. Because, the Tribe and PGE argue, DRA has not alleged that the Tribe is in violation of

the CWA, only that PGE is, the Tribe's immunity is not abrogated for purposes of this lawsuit. Although this raises an interesting theoretical point,[1] it is not the situation before the Court. DRA has represented that, if the Court concludes the Tribe is a necessary party, DRA would amend its complaint to assert claims against the Tribe, in addition to PGE, for violation of the CWA. Because the Tribe is a licensee and part-owner and part-operator of the Project, it is reasonable to believe that DRA could assert the same or substantially similar claims against the Tribe as DRA has asserted against PGE. In this case, therefore, the citizen suit provision of the CWA is not rendered inapplicable because of the requirement that a person be "alleged to be in violation."

DRA argues that because the citizen suit provision provides for actions against "persons," which is defined by Section 1362 to include Indian tribes, Congress has abrogated tribal sovereign immunity. Section 1362(5) of the CWA provides that "[t]he term 'person,'" as used in the CWA, "means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5). "Municipality," in turn, is defined as "a city, town, borough, county, parish, district, association, or other public body created by or pursuant to State law and having jurisdiction over disposal of sewage, industrial wastes, or other wastes, *or an Indian tribe or an authorized Indian tribal organization*, or a designated and approved management agency under section 1288 of this title." 33 U.S.C. § 1362(4) (emphasis added). These definitions apply "[e]xcept as otherwise specifically provided." 33 U.S.C. § 1362.

_____

[1] For example, if the Tribe's interest in this action derived only from its proximity to the Pelton Project, or the Project's effect on tribal resources, but the Tribe held no responsibility for the ownership or operation of the Project, and the Project itself was not operated on tribal land, the Tribe may still be a necessary party due to its interests, but DRA likely could not allege that the Tribe had violated the CWA. In that case, the Tribe likely would retain its sovereign immunity because the only purported basis for an abrogation—the CWA—would be inapplicable to the Tribe.

At least one court has held that the citizen suit provision of the CWA abrogates the sovereign immunity of Indian tribes. *See Atl. States Legal Found. v. Salt River Pima-Maricopa Indian Cmty.*, 827 F. Supp. 608, 609-10 (D. Ariz. 1993). *Atlantic States* relied on an Eighth Circuit case, *Blue Legs v. U.S. Bureau of Indian Affairs*, which interpreted a provision in the Resource Conservation and Recovery Act of 1976 ("RCRA") that is similar to CWA § 1365 to find that Congress has abrogated a Tribe's sovereign immunity in RCRA. 867 F.2d 1094 (8th Cir. 1989). As the Eighth Circuit explained in *Blue Legs*:

> Under the RCRA, citizens are permitted to bring compliance suits "against any person (including (a) the United States, and (b) any other governmental instrumentality or agency) who is alleged to be in violation." 42 U.S.C. § 6972(a)(1)(A). "Person" is subsequently defined to include municipalities. 42 U.S.C. § 6903(15). Municipalities include "an Indian tribe or authorized tribal organization." 42 U.S.C. § 6903(13)(A). It thus seems clear that the text and history of the RCRA clearly indicates congressional intent to abrogate the Tribe's sovereign immunity with respect to violations of the RCRA.

*Blue Legs*, 867 F.2d at 1097 (citations and alterations omitted).

In addition, the Ninth Circuit referred to *Blue Legs* in *Miller v. Wright*, 705 F.3d 919, 926 (9th Cir. 2013), noting the Eighth Circuit's holding on RCRA, as well as other cases finding an abrogation of tribal sovereign immunity, and stating: "Unlike these laws, federal antitrust law does not 'unequivocally express[] in explicit legislation' that it abrogates tribal sovereign immunity." *Miller*, 705 F.3d at 926 (quoting *Krystal Energy Co. v. Navajo Nation*, 357 F.3d 1055, 1056 (9th Cir. 2004)). This suggests an agreement that RCRA *does* unequivocally abrogate tribal sovereign immunity. Other courts have similarly held that definitional sections in statutes are sufficient to abrogate tribal sovereign immunity. *See, e.g.*, *Osage Tribal Council v. U.S. Dep't of Labor*, 187 F.3d 1174, 1182 (10th Cir. 1999) ("We hold that where Congress grants an agency jurisdiction over all 'persons,' defines 'persons' to include 'municipality,' and

in turn defines 'municipality,' to include 'Indian Tribe[s],' in establishing a uniform national scheme of regulation of so universal a subject as drinking water, it has unequivocally waived tribal immunity.").

The Tribe and PGE argue that because "person" in Section 1365 is followed by "(including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution)," Section 1365 "specifically provide[s]" a unique definition of "person," making the general definition of "person" in Section 1362 inapplicable. The Tribe and PGE also argue that Section 1365 *impliedly* uses a different definition of "person," because it defines "person" to include the United States, and thus cannot be the same "person" as used in Section 1362. The problem with this argument, however, is that even assuming, *arguendo*, that Section 1365 *did* create an entirely new definition of person, the Tribe and PGE provide no workable alternative definition of "person" for purposes of the citizen suit provision.

Elsewhere, the Tribe and PGE suggest that in the absence of a specific definition displacing that in Section 1362, but where it would make little sense to apply Section 1362's definition,[2] "person" should be interpreted according to its plain meaning, or otherwise given the most logical definition based on its context. It is perfectly logical, however, to apply Section 1362's definition of "person" in Section 1365 and to then add the United States and expressly limit the provision's applicability to states, which are included in the broad definition of person,

---

[2] The Tribe and PGE point to several examples within the CWA where it would make little sense to apply Section 1362's definition of "person," which includes entities like corporations. For instance, in provisions requiring research on "the harmful effects on the health or welfare of persons causes by pollutants," or authorizing scholarships for "undergraduate study by persons," the Tribe and PGE argue, Congress used "persons" merely to mean natural, human individuals, without expressly stating so. The Court addresses the Tribe and PGE's argument on this matter without weighing in directly on the meaning of "persons" within these other CWA provisions.

by limiting suits against governmental entities to those allowed under the Eleventh Amendment. Contrary to PGE and the Tribe's argument, there is no "absurd result" that must be avoided in this case. Further, in some other CWA provisions, the Tribe and PGE argue, "person" must be given its plain meaning, denoting simply a natural, or human, individual. Applying this definition to Section 1365, however, would itself have an absurd result: only individuals, the United States, and other governmental instrumentalities or agencies, excluding claims against states for civil penalties and declaratory relief, could be subject to citizen suits for violations of the CWA. That would mean that PGE, a non-government and non-human entity, could not be subject to this suit, which is an illogical and untenable result. *See Decker v. Northwest Environmental Defense Ctr.*, 568 U.S. 597 (2013) (suit under § 1365 against, among other parties, a logging and paper-product company); *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000) (citizen suit against company). To hold, therefore, that "person" in Section 1365 means something entirely new, and to infer a definition from the little context provided, or apply the plain meaning of the word "person," would render "person" in Section 1365 woefully under-inclusive.

PGE also argues that Section 1365 cannot be read simply to add the United States to the list of "persons" defined in Section 1352, because elsewhere in the CWA Congress added one term to the definition of "persons" in a more precise way, indicating that Congress knew how to do this and therefore purposely did not do so in Section 1365. Specifically, in 33 U.S.C. § 1319(6), the CWA provides: "For the purpose of this subsection, the term 'person' means, in addition to the definition contained in section 1362(5) of this title, any responsible corporate officer." PGE points out that Congress used different text in Section 1365. PGE cites *Russello v. United States*, 464 U.S. 16 (1983), for the proposition that differing text between subsections of

the same statute should not be presumed to have the same meaning. In *Russello*, the Court

interpreted two provisions of the RICO statute, one that applied to "any interest . . . acquired,"

and one that applied to "any interest in . . . any enterprise which the defendant has established,

operated, controlled, conducted, or participated in the conduct of, in violation of section 1962."

*Russello*, 464 U.S. at 23 (quoting 18 U.S.C. § 1963(a)(1), (a)(2) (alterations omitted)). The Court

concluded that "[h]ad Congress intended to restrict § 1963(a)(1) to an interest in an enterprise, it

presumably would have done so expressly as it did in the immediately following

subsection (a)(2)." *Id*. Thus, the Court refused to give the two provisions the same meaning.

　　Relying on this principle of statutory construction, PGE argues that the "including"

parenthetical in Section 1365 should not be given the same meaning as the text in

Section 1319(6), which adds "responsible corporate officer" to the definition of "person" under

Section 1362 by using the term "in addition to." The Court recognizes the general principle of

statutory interpretation, reflected in *Russello*, that "[w]here Congress includes particular

language in one section of a statute but omits it in another section of the same Act, it is generally

presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."

*Russello*, 464 U.S. at 23. Nonetheless, the use of the term "including" in Section 1365 is not so

different from the use of the term "in addition to" in Section 1319(6) that the Court finds any

meaningful difference to attribute to Congress' intent. To "include" means "to place, list or rate

as a part or component of a whole or of a larger group, class, or aggregate," or "to take in,

enfold, or comprise as a discrete or subordinate part or item of a larger aggregate, group, or

principle." Webster's Third New International Dictionary (2002). This is nearly indistinguishable

from the plain meaning of "in addition to." Although Section 1319(6) may have added to

Section 1362's definition of "person" more explicitly than did Section 1365, the Court finds no reasonable diverging meaning to glean from these two variations in word use.

PGE also argues that if Congress had simply intended to add to the definition of "persons" already provided, then it would have been superfluous to also reference state entities, which are already included in the definition of "persons" in Section 1362. Section 1365, however, does more than reference states—it references all other governmental instrumentalities or agencies—and it is far from clear that these bodies are all included in the general definition of "person." Furthermore, as DRA argues, and as PGE now agrees, the qualifying text "to the extent permitted by the Constitution" actually operates to *remove* states from definition of "persons" against whom citizen suits may be initiated, based on Eleventh Amendment immunity.[3]

Finally, PGE argues that Section 1365 is a grant of jurisdiction only, and not an abrogation of sovereign immunity. PGE first suggests that the title of Section 1365(a) indicates that it is a grant of jurisdiction. Regardless of whether a statute's title is a proper consideration at this stage, *see Pennsylvania Dept of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) ("The title of a statute cannot limit the plain meaning of the text. For interpretive purposes, it is of use only when it sheds light on some ambiguous word or phrase.") (quotation marks and alterations omitted), the full title of Section 1365(a) is: "Authorization; jurisdiction." Its title therefore denotes something that is more than simply jurisdictional, and actually *authorizes* suits.

PGE also relies on *Blatchford v. Native Vill. of Noatak and Circle Vill.*, 501 U.S. 775 (1991). In *Blatchford*, the Supreme Court interpreted a statute that read:

---

[3] The Tribe and PGE asserted the opposite position in their initial briefing, but in supplemental briefs argue that this text indicates that states *do* have sovereign immunity from suits for damages.

> The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.

*Blatchford v. Native Vill. of Noatak & Circle Vill.*, 501 U.S. 775, 783 (1991) (quoting 28 U.S.C. § 1362). The respondents argued that this provision operated to abrogate state sovereign immunity from suits brought by Indian tribes. The Court disagreed, finding the statute to be nothing more than a grant of jurisdiction, mirroring "any number of other grants of jurisdiction to district courts to hear federal-question claims." *Id*. at 783, 786. The Court noted that "[t]he fact that Congress grants *jurisdiction* to hear a claim does not suffice to show Congress has abrogated all *defenses* to that claim. The issues are wholly distinct." *Id*. at 786 n. 4.

Although a grant of jurisdiction is distinct from an abrogation of sovereign immunity, the Court disagrees with PGE's argument that Section 1365 is nothing more than a grant of jurisdiction. Section 1365 provides that "any citizen may commence a civil action . . ." and only later adds that "[t]he district courts shall have jurisdiction" to hear such actions. The first part of the provision, therefore, does something more than grant jurisdiction.[4] In fact, if the citizen suit provision were merely a grant of jurisdiction, then it would follow that sovereign immunity of the *United States* has not been abrogated for citizen suits—another untenable result. *See, e.g.*, *ONRC Action v. U.S. Bureau of Reclamation*, 798 F.3d 933 (9th Cir. 2015) (allowing citizen suit under CWA to proceed against United States).

The parties now agree that Section 1365 does not abrogate *state* sovereign immunity, although they disagree about why that is the case. PGE now argues, as discussed, that the

---

[4] Notably, in their original briefing on this motion, PGE and the Tribe argued that Section 1365 expressly abrogated the sovereign immunity of the United States and of individual states, and insisted that because Congress had done so explicitly without mentioning Indian tribes, Congress had not intended to abrogate the sovereign immunity of tribes.

provision is simply not an abrogation of sovereign immunity at all, and that the parenthetical reference to the Eleventh Amendment "clarif[ies]" that sovereign immunity under the Eleventh Amendment was preserved. But as PGE argues elsewhere, an interpretation of a statute that would render text superfluous is to be avoided. *Corley v. United States*, 556 U.S. 303, 314 (2009) (noting that "one of the most basic interpretive canons" is that "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant") (alterations omitted). If the citizen suit provision would not otherwise operate to abrogate sovereign immunity, such a clarification would be superfluous. DRA argues that the parenthetical reference to the Eleventh Amendment *restores* State sovereign immunity. PGE retorts that DRA has made no showing of an initial *abrogation* of sovereign immunity for which a *restoration* would needed. PGE again urges that abrogation may not be found in the use of the term "person" and in its definition. For the reasons discussed above, the Court disagrees. Lastly, PGE argues that the inclusion of tribes in the definition of "municipalities" was intended only to allow tribes to receive federal aid under the CWA. The Court is unpersuaded by PGE's sparse support for this proposition.

Interpreting Section 1365 to abrogate the sovereign immunity of Indian tribes and the United States, but not of individual states does raise the question of why Congress would have expressly provided that the citizen suit provision did not abrogate state sovereignty under the Eleventh Amendment, but not done the same for tribal sovereign immunity. At first glance, this presents some incongruity. Any meaning that could be gleaned from this apparent mismatch, however, is lessened by the fact that Congress *did* clearly intend to differentiate between states and the federal government—providing for citizen suits against the latter but not the former—

negating the potential concern that this mismatch suggests it was not Congress' intent to treat Indian tribes differently from states.

The Court concludes that Section 1365 of the CWA abrogates the sovereign immunity of Indian tribes. The Court agrees with other courts that have found that where a statute defines "person" to include "tribes," and allows citizen suits against "persons," Congress has made a clear and unequivocal waiver of tribal sovereign immunity. The Court is unpersuaded by the Tribe and PGE's argument that the CWA's citizen suit provision, by explicitly mentioning the United Sates and other governmental bodies, meant to remove Indian tribes from the CWA's general definition of "person." "Person," as generally defined in the CWA, does not include the United States. Giving the term "including" its plain meaning, Section 1365 *adds* the United States to the definition of "person," and expressly preserves state sovereign immunity under the Eleventh Amendment, but not tribal sovereign immunity. Because the citizen suit provision of the CWA abrogates tribal immunity, it is feasible to join the Tribe—a necessary part—to this action.

## CONCLUSION

The Tribe is a necessary party in this action, and it is feasible to join the Tribe because Congress has abrogated the Tribe's sovereign immunity against suit under the CWA. Accordingly, the Tribe's motion to dismiss (ECF 72) and PGE's motion to dismiss (ECF 74) are DENIED, the Tribe shall be joined as a Defendant, and DRA may file an amended complaint within 14 days from the date of this Opinion and Order.

**IT IS SO ORDERED**.

DATED this 11th day of June, 2018.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge