# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **DESCHUTES RIVER ALLIANCE**, | Case No. 3:16-cv-1644-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **PORTLAND GENERAL ELECTRIC COMPANY, *et al.*,** | |
| Defendants. | |

Daniel M. Galpern, LAW OFFICE OF DANIEL M. GALPERN, 2495 Hilyard Street, Suite A, Eugene, OR, 97405; J. Douglas Quirke, OREGON CLEAN WATER ACTION PROJECT, P.O. Box 11501, Eugene, OR, 97440; Jonah L. Sandford, DESCHUTES RIVER ALLIANCE, 5331 SW Macadam Avenue, Suite 330, Portland, OR, 97239. Of Attorneys for Plaintiff.

Beth S. Ginsberg, STOEL RIVES LLP, 600 University Street, Suite 3600, Seattle, WA, 98101; Michael R. Campbell, STOEL RIVES LLP, 760 SW Ninth Ave, Suite 3000, Portland, OR, 97205. Of Attorneys for Defendant Portland General Electric.

Josh Newton and Benjamin C. Seiken, KARNOPP PETERSEN LLP, 360 SW Bond Street, Suite 400, Bend, OR, 97702. Of Attorneys for Defendant Confederated Tribes of the Warm Springs Reservation of Oregon.

Scott J. Kaplan and Frank Hammond, Senior Assistant Attorneys General, OREGON DEPARTMENT OF JUSTICE, 1162 Court Street NE, Salem, OR, 97301. Of Attorneys for Amicus Oregon Department of Environmental Quality.

**Michael H. Simon, District Judge.**

Plaintiff Deschutes River Alliance ("DRA") is a nonprofit advocacy organization comprised of individuals in Oregon who use, enjoy, and recreate in the Deschutes River and its tributaries in the vicinity of the Pelton Round Butte Hydroelectric Project ("Pelton Project" or "Project"). The Project is co-owned and co-operated by Defendants Portland General Electric Company ("PGE") and The Confederated Tribes of the Warm Springs Reservation of Oregon (the "Tribe"). The Tribe consists of three Indian tribal groups—the Warm Springs, the Wasco, and the Paiute. Plaintiff sues PGE and the Tribe, alleging that Defendants' operation of the Project violates the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (commonly known as the "Clean Water Act" ("CWA")). Before the Court are the parties' cross-motions for summary judgment. Plaintiff moves for partial summary judgment on Defendants' liability under the CWA. Defendants cross-move for summary judgment, seeking dismissal of this action.

Plaintiff's lawsuit arises under Section 505(a)(1) of the CWA, codified at 33 U.S.C. § 1365(a)(1), commonly known as the CWA's "citizen suit provision." Plaintiff argues that the Project is operating in violation of its CWA § 401 Certificate (the "Certificate" or "Certification," used interchangeably), issued by the Oregon Department of Environmental Quality ("DEQ"). Plaintiff alleges that the Project's discharges in the lower Deschutes River exceed water quality standards and criteria specified in management plans incorporated into the Project's Certificate, as well as the management plans' requirement that Defendants adaptively manage the Project. Because the Court concludes that the Project is not violating its § 401 Certificate, the Court denies Plaintiff's motion for partial summary judgment and grants Defendants' cross-motions.

# BACKGROUND

## A. Legal Background

In 1972, Congress enacted the CWA to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. §1251(a). Except when in compliance with one of the permitting schemes in the Act, the "discharge of any pollutant by any person" is prohibited. *Id.* § 1311(a). States have the "primary responsibilities and rights" to "prevent, reduce, and eliminate pollution" and "to plan the development and use (including restoration, preservation, and enhancement) of land and water resources[.]" *Id.* § 1251(b). To that end, the CWA imposes several duties on states, including adopting water quality standards for waters within the state. *Id.* § 1313. "Water quality standards . . . consist of a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses." 40 C.F.R. § 131.3(i). Water quality *criteria* "are elements of State water quality standards, expressed as constituent concentrations, levels, or narrative statements, representing a quality of water that supports a particular use." 40 C.F.R. § 131.3(b).

Oregon has designated the Deschutes River downstream of the Project—the relevant area for purposes of this lawsuit—to be used, among other things, for "Fish and Aquatic Life." OAR 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, Table 130A. The area is designated for "Core Cold Water Habitat Use," which "means waters expected to maintain temperatures within the range generally considered optimal for salmon and steelhead rearing, or that are suitable for bull trout migration, foraging and sub-adult rearing that occurs during the summer." Figure 130A; OAR 340-041-002(13). Additionally, between October 15 and June 15 of each year, the area is designated for salmon and steelhead spawning use. Figure 130B. "Water quality in the Deschutes Basin . . . must be managed to protect the designated beneficial uses." OAR 340-041-0130(1). Oregon has also

adopted numeric water quality criteria for, as relevant here, temperature, dissolved oxygen, and pH. *See* OAR 340-041-0028 (temperature); -0016 (dissolved oxygen); -0021 (pH).

States ensure compliance with water quality standards under Section 401 of the CWA, which applies when an applicant seeks a federal license or permit to undertake any activity that might result in any discharge into navigable waters. *Id.* § 1341. Under Section 401(a) of the CWA, the state's "certification" means that "any such discharge will comply with the applicable provisions of Sections [301], [302], [303], [306] and [307] of this title." *Id.* § 1341(a)(1). Section 401(d) of the CWA also provides:

> Any certification . . . shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant . . . will comply with any applicable effluent limitations and other limitations, under section [301 or 302] of this title, standard of performance under section [306] of this title, or prohibition, effluent standard, or pretreatment standard under section [307] of this title, and with any other appropriate requirement of State law set forth in such certification[.]

*Id.* § 1341(d). The certification conditions "shall become a condition on any" federal license. *Id.* Oregon defines a 401 Water Quality Certification as "a determination . . . that a . . . federally licensed or permitted activity that may result in a discharge to waters of the state has adequate terms and conditions to prevent an exceedance of water quality criteria." OAR 340-041-0002.

Congress intended states to take the lead in enforcement actions under the CWA. *Gwaltney*, 484 U.S. at 60 (commenting "[t]he [Senate] Committee [on Public Works] intends the great volume of enforcement actions [to] be brought by the State[.]"). The CWA also, however, empowers citizens to bring enforcement actions against any person alleged to be in violation of federal water pollution standards or limitations. *See* 33 U.S.C. § 1365(a)(1). "[T]he purpose behind the citizen-suit provision in the CWA is to ensure enforcement of federal environmental requirements irrespective of the actions of state agencies. The CWA plainly and unambiguously

confers an opportunity among citizens to sue alleged violators when government agencies fail to act." *Or. State Pub. Interest Grp., Inc. v. Pac. Coast Seafoods Co.*, 341 F. Supp.2d 1170, 1179 (D. Or. 2004) (citing *Ass'n to Protect Hammersley Eld, & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1014 (9th Cir. 2002)). The Court has held that citizens may sue to enforce *conditions* in a Section 401 certification, not just the requirement that a certification be obtained. ECF 22.

## B. Factual Background

### 1. Licensing History

The Pelton Project consists of three dams on the Deschutes River: the Round Butte Dam, the Pelton Dam, and the Reregulating Dam. ECF 73 at 4, ¶ 11. The Project is situated in Jefferson County, Oregon, within and adjacent to the Warm Springs Indian Reservation.[1] ECF 73 at 3, ¶ 6; 93 F.E.R.C. ¶ 61,183. In 1951, the Federal Power Commission ("FPC"), predecessor to the Federal Energy Regulatory Commission ("FERC"), issued a 50-year license to PGE for the Pelton Project. *Id*. at ¶ 12. In 1980, FERC amended the license to designate PGE and the Tribe as joint licensees for the Pelton Project, allowing the Tribe to construct power generation facilities in the Reregulating Dam. *Id*. at ¶ 16. In April 2000, PGE, the Tribe, and the United States Department of Interior entered into a Long-Term Global Settlement and Compensation Agreement ("GSA"). *Id*. at ¶ 20. The GSA was approved by FERC and the Oregon Public Utility Commission and ratified by Congress. *See In Re Portland Gen. Elec. Co.*, Order No. 00-459, 2000 WL 1504844 (Aug. 22, 2000); 93 F.E.R.C. ¶ 61,183 (2000); PL 107-102, December 27, 2001, 115 Stat 974.

---

[1] Pursuant to a treaty executed on June 25, 1855, between the United States and the Tribes and Bands of Middle Oregon, the Reservation is reserved for the exclusive use of, and serves as a permanent homeland to, the Tribe, which is the legal successor in interest to the Indian signatories to the 1855 Treaty. ECF 73 at 2-3, ¶¶ 4, 6.

In June 2001, PGE and the Tribe jointly applied for a new FERC project license. ECF 73 at ¶ 23. PGE and the Tribe simultaneously filed applications for water quality certifications for the Pelton Project, pursuant to CWA Section 401, with both the Tribe's Water Control Board ("WCB") and with Oregon's Department of Environmental Quality ("DEQ" or "ODEQ"). *Id.* In June 2002, WCB and DEQ issued their respective water quality certifications. Beginning in January 2003, PGE and the Tribe participated in a facilitated Settlement Working Group with various governmental and non-governmental stakeholders to resolve issues associated with the relicensing of the Pelton Project. *Id.* at ¶ 25. The Settlement Working Group produced a Settlement Agreement Concerning the Relicensing of the Pelton Round Butte Hydroelectric Project, FERC Project 2030 ("Relicensing Settlement Agreement"). *Id.*; ECF 73-7. In July 2004, the Tribe and PGE submitted the Relicensing Settlement Agreement to FERC for approval, along with an Offer of Settlement and Joint Explanatory Statement and Request for Technical Conference ("Explanatory Statement"). ECF 75-2. On June 21, 2005, FERC approved the settlement and issued a new license to PGE and the Tribe as joint licensees of the Pelton Project. ("2005 License"). 111 FERC ¶ 61,450 (2005). The 2005 License incorporates most of the proposed license articles contained in the Relicensing Settlement Agreement, as well as the DEQ water quality certification. *Id.*

### 2. Certification and Water Quality Management and Monitoring Plan

During the original license term, the Project did not meet water quality standards for temperature, dissolved oxygen, and pH. ECF 73 at ¶ 24; ECF 73-8 at 3, 23. The Project dams also created a total barrier to migration by resident and anadromous fish in the Deschutes River, preventing anadromous and resident salmonids from reaching historical spawning and rearing areas. ECF 75-2 at 4. This threatened several species of fish, including some listed as endangered

under the federal Endangered Species Act. ECF 73-8 at 25. By 1973, attempts at effectuating fish passage were abandoned in favor of a fish hatchery. ECF 73 ¶ 26.

The "centerpiece" of the Relicensing Settlement Agreement is a Fish Passage Plan. ECF 73-8 at 18 (Explanatory Statement). This plan is incorporated into the 2005 License. *See* 111 F.E.R.C. ¶ 61,450; ECF 73 ¶ 30. The 2005 License also establishes Implementation Committees—a component of the Relicensing Settlement Agreement—including a Fish Committee, which consists of Defendants, several non-governmental organizations, and various federal, state, and tribal agencies. *Id*. ¶ 31. The Fish Committee oversees the Fish Passage Plan's implementation. ECF 75-1 at 11; ECF 75-2 at 16.

In order to meet the key goal of restoring fish passage through the Project, the Certification, and the Fish Passage Plan, required Defendants to construct, test, and operate a selective water withdrawal facility (the "SWW"). ECF 66-8 at 1; ECF 73-8 at 24 ("The restoration of fish passage at the Project through the construction of [the SWW] facility at Round Butte Dam is the centerpiece of the [Relicensing] Settlement Agreement."). As required by the 2005 License, Defendants designed the SWW in consultation with the Fish Committee, and the designated "Fish Agencies" (National Marine Fisheries Service, U.S. Fish and Wildlife Service, Oregon Department of Fish and Wildlife, and Bank of Natural Resources of the Confederated Tribes of the Warm Springs Reservation of Oregon) and FERC approved the design. ECF 89 ¶ 7. The SWW allows "water withdrawal from both the surface (warmer epilimnion) and the bottom (cooler hypolimnion) of the reservoir." ECF 73-7 at 512. The SWW was designed both to allow fish passage, and to "[h]elp the Project meet temperature and water quality goals and standards in the lower Deschutes River and Project reservoirs." ECF 73-7 at 512-13.

The DEQ Certification, which became a condition on the 2005 License, incorporates a Water Quality Management and Monitoring Plan ("WQMMP"). The Certification noted that the WQMMP would be revised and approved after the Certification itself was approved. Upon DEQ approval of the revised WQMMP, the WQMMP became a "part of" the Certification. ECF 66-8 at 1. The WQMMP "describes procedures that will be employed by [PGE] and the [Tribe] . . . to satisfy the requirements of" the DEQ Certification. The WQMMP contains several specific management plans, including, as relevant here: a Water Temperature Management Plan ("TMP"), a Dissolved Oxygen Management Plan ("DOMP"), and a pH (Hydrogen Ion Concentration) Management Plan ("PHMP"). The Certification mandates that the SWW be operated in accordance with the TMP (ECF 66-8 at 1), the DOMP (ECT 66-8 at 4), and the PHMP (ECF 66-8 at 6) contained in the WQMMP. The Certification also requires Defendants to implement a Water Quality Monitoring Plan ("WQMP") contained within the WQMMP.

The WQMMP incorporates state water quality standards, and outlines a detailed plan for compliance with those standards. Shortly before the revised WQMMP was finalized, Oregon's Environmental Quality Commission adopted new temperature standards for the Deschutes Basin. ECF 95 ¶ 23. The EPA approved the new standards in March 2004. *Id*. These standards were not, however, incorporated into the revised WQMMP. Thus, the WQMMP, and the management plans within it, refer to—and structure compliance plans around—outdated water quality standards for both temperature and dissolved oxygen.

Based on results of hydrodynamic and temperature modeling, the drafters concluded that blends of surface and bottom water listed in Table 2.1 of the WQMMP (called Blends 13 and 16) would "result in compliance with the temperature standard throughout the year," would comply with the dissolved oxygen criteria for most of the year (and, otherwise, would not sink below a

different, lower standard), and would "suffice for management of pH as well." ECF 73-7 at 515-523. The WQMMP outlines the measures Defendants are to take based on conditions at the Project. For instance, "[i]f the temperature approaches the maximum limit, the percentage of deep water discharged will be adjusted upward." *Id*. at 519. Generally, "adjustments to the withdrawal blend will be made automatically by [Defendants] to ensure that discharges meet the applicable temperature standard." *Id*. With respect to dissolved oxygen, because "[c]ontrolled spills at the Reregulating Dam have been shown to increase DO concentration in the discharge" of the Project, "if under the temperature management selective withdrawal regime it appears that the DO concentration in the Reregulating Dam discharge is going to drop below 11.0 mg/L or 96% saturation, [Defendants] will institute controlled spills at the Reregulating Dam" to raise dissolved oxygen concentration. *Id*. at 521. Similarly, although the drafters expected that the blends and measures undertaken to maintain temperature and dissolved oxygen targets would suffice for managing pH, the PHMP provides that "if pH at the Reregulating Dam is found to exceed that of the weighted average of the inflows," Defendants must "immediately contact ODEQ and CTWS WCB to develop an approach to reduce pH that is consistent with maintaining compliant temperature and DO values and surface withdrawal volumes necessary to facilitate smolt movement in Lake Billy Chinook." *Id*. at 524. This eventuality was not expected to occur, however, because data indicated that inflow pH exceeded that of Project discharge.

The three water quality standards and goals at issue in this case—temperature, dissolved oxygen concentration, and pH, are sometimes in tension with one another, and with the Fish Passage Plan.[2] As Defendants explain, increasing the proportion of cold deep water discharged,

[2] Plaintiff argues that these various goals cannot be in tension because the Certification and WQMMP suggest that each of these goals can be attained if the SWW is operated in accordance with the management plans. Plaintiff's argument essentially is that it is Defendants'

which serves to lower water temperature, can impair fish passage, because there is a strong, inverse relationship between deep-water withdrawals and the number of downstream migrating fish that can be captured and transported downstream below the Project. ECF 89 ¶ 12. It also has the effect of reducing dissolved oxygen concentration in the river downstream of the Project, because bottom water is relatively low in dissolved oxygen compared to surface water. ECF 90 ¶ 9. Additionally, it results in a lower supply of cold water in the reservoir, which may mean higher river temperatures later in the year, when less cold water is available for temperature control. *Id*. Finally, as DEQ explains, "[t]here is no operational procedure that can lower pH without adversely affecting temperature or dissolved oxygen, because bottom water that has a lower pH also has less dissolved oxygen." ECF 95 ¶ 32.

The Settlement Working Group, in devising the SWW and WQMMP, relied on "mathematical models," with "no way to know how accurately these models would match the response of the reservoirs and river once the SWW became operational." ECF 95 ¶ 20. Thus, the WQMMP calls for an overall adaptive management approach to Project operations:

> Because operation of the selective withdrawal facility has the potential to affect numerous water quality parameters, as well as fish passage success, changes in the operation of the selective withdrawal facility must consider all possible impacts, not merely a single water quality parameter. In addition, actual impacts to water quality and currents will not be known with certainty until the selective withdrawal facility is constructed, operated, and monitored, highlighting the need for an adaptive management approach to ensure compliance with water quality standards.
>
> For the purpose of satisfying water quality standards for temperature, DO, pH, and nuisance phytoplankton, as well as ensuring downstream fish passage, and implementing the adaptive

responsibility somehow to find a way to meet each of these standards simultaneously. Plaintiff does not, however, dispute Defendants' factual assertions that it is sometimes impossible for the Project, and the SWW required by the Certification, simultaneously to comply with each of the water quality criteria in the WQMMP as well as with the Certification's fish passage goals.

management requirements of the § 401 certification and the
Section 401 Implementation Agreement, the Joint Applicants shall
operate the selective withdrawal facility pursuant to general
adaptive management considerations.

ECF 73-7 at 513.

The Explanatory Statement describes what "adaptive management" means:

The essence of adaptive management is to view management
actions as having an experimental component designed both to
protect the resource and to produce critical information about the
resource being managed, and to make changes in future
management actions that reflect the knowledge gained through
these measures. Thus, adaptive management includes three main
components: 1) the implementation of specific protection,
mitigation and enhancement measures designed to avoid or
minimize the impact of a project on specific resources; 2)
monitoring and evaluation of the measures to evaluate their
performance towards the agreed-upon criteria, resource goals,
objectives and expectations; and 3) implementing alterations and
management changes that improve future performance if criteria,
resource goals, objectives and expectations are not met. This
approach helps to reduce uncertainty and, more importantly,
provides a broader base of knowledge and experience that helps
managers to manage more effectively in the face of continued
uncertainty and ever-changing conditions.

ECF 73-8 at 36-37; *see also* 73-7 at 108, 129.

The WQMMP also recognized that "[o]ver time, it is expected that Project operators will

further refine the correlation between air temperature, wind, and other environmental variables

and discharge temperature at the Reregulating Dam as compared to Round Butte Dam, and as

compared to conditions that would exist if the Project were not present." ECF 73-7 at 519. The

drafters similarly expected that Defendants would, over time, "further refine the relationship

between DO concentration [and pH] in the Round Butte Dam tailrace and the Reregulating Dam

discharge, which will lead to more effective prediction of when DO [or pH] concentrations in the

Reregulating Dam tailrace might approach ODEQ and CTWS standards." ECF 73-7 at 522, 524.

Improving each of these correlations, the WQMMP predicted, would allow for quicker and more accurate adjustments.

### 3. Project Operation and Plaintiff's Lawsuit

The SWW has been operational since 2009. ECF 95 ¶ 25. As a result of the SWW, anadromous fish are now passing both upstream and downstream through the Pelton Project. Shortly after the SWW began operating, however, "[i]t became apparent . . . that controlling temperatures with the existing automated systems would be a challenge and fine-scale management might be impossible." ECF 95 ¶ 25. Several unexpected challenges also arose. Operators discovered that the SWW could only release a finite amount of cold bottom water, which complicated temperature outcomes in the late summer and early fall. Further, dissolved oxygen levels became an issue in summer, due to the "competing nature of blending, because the cold water needed to reduce temperatures was oxygen depleted compared to the warmer surface waters." ECF 95 ¶ 25. Plaintiff submits monitoring data for the water below the Project, showing numerous days on which the water quality criteria discussed in the WQMPP have not been achieved.

Beginning in 2011, DEQ, recognizing that issues arising shortly after construction of the SWW indicated that Defendants "needed time to learn how to operate the facility and optimize mitigation as required by the WQMMP," entered into "Interim Agreements" with Defendants on approximately an annual basis. *See* ECF 90-1 through 90-7. These Interim Agreements "specified appropriate water-quality limits and tolerance for exceeding these limits until the facilities were operating at their highest potential." ECF 95 ¶ 25. In the 2011 Interim Agreement, PGE agreed to operate the SWW in accordance with a "modified flow blend," known as "Blend 17," rather than to use Blend 13 or Blend 16, which the WQMMP called for. ECF 90-1 at 2.

Defendants operate the SWW in accordance with Blend 17 "unless a deviation from that blend is needed to reduce water temperatures in the river downstream of the Project." ECF 90 ¶ 12. Under Blend 17, the SWW lets out exclusively surface water between November 1 and June 30 of each year. *Id*. This helps with fish passage and with the collection and storage of cold water for use later in the year, when it is needed to reduce river temperature. Between July 1 and October 1, Blend 17 calls for a gradual increase in the proportion of bottom water until that proportion reaches 50 percent. This helps reduce river temperature during the summer and early fall, while also still providing surface flows needed to help downstream fish passage. *Id*.

DEQ has publicly stated its intention to modify the WQMMP and Certification for the Project based on what DEQ and Defendants have learned over several years of SWW operation. ECF 95 ¶ 28. The Tribe's own WCB is in the process of adopting revised criteria for the area, and is expected to complete this process within the coming months. To ensure that any future changes to the DEQ Certification and the WQMMP are consistent with both tribal and State water quality standards, DEQ has indicated that once the Tribe's process is complete, DEQ will begin modifying the Certification issued to the Project. This modification process will include a notice and public comment period. ECF 95 ¶ 28.

Nonetheless, DEQ has concluded that Defendants have met the Certification conditions requiring construction and operation of the SWW, and the facilitation of fish passage. *Id*. ¶ 30. DEQ has also concluded that Defendants have "worked diligently to manage these facilities in the most effective way to achieve outcomes expressed in the WQMMP." *Id*. DEQ also states that, based on reporting provided by Defendants, "the project has largely met the currently applicable water quality standards for temperature and dissolved oxygen for approximately the last 5 years," referring to the "targets set forth in the Interim Agreements." *Id*. ¶ 32. Specifically,

"[w]hen there was a departure from expected temperatures or dissolved oxygen," which occurred in the summer of 2015, "PGE and the Tribe[] made timely changes in order to balance competing processes . . . as well as possible." *Id.*

## STANDARDS

### A. Summary Judgment Standard

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

When parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the non-moving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence,

regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632

F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial,

the moving party need only prove that there is an absence of evidence to support the non-moving

party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the

non-moving party bears the burden of designating "specific facts demonstrating the existence of

genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed

that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as

to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## B. Standards for Interpreting a Section 401 Certification

The parties dispute the proper way to interpret the Certification and, specifically, how to

identify a violation of the Certification. The Court's task "is to determine what Plaintiffs are

required to show in order to establish liability under the terms of this particular [Certification]."

*Nat. Res. Def. Council, Inc. ["NRDC"] v. Cty. of Los Angeles*, 725 F.3d 1194, 1205 (9th

Cir. 2013) (emphasis omitted).

The Court interprets the Certification "like any other contract." *NRDC*, 725 F.3d at 1204

(interpreting a NPDES permit) (citing *Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979, 982

(9th Cir. 1995) ("We review the district court's interpretation of the 1984 permit as we would the

interpretation of a contract or other legal document.")). The Certification "must be read as a

whole and every part interpreted with reference to the whole, with preference given to reasonable

interpretations." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th

Cir. 1999), *as amended*, 203 F.3d 1175 (9th Cir. 2000). The terms of the Certification must "be

given their ordinary meaning." *Id*. The Court must also "give effect to every word or term . . .

and reject none as meaningless or surplusage." *NRDC*, 725 F.3d at 1206 (quotation marks

omitted). An interpretation that "would create an unreasonable result" must "be rejected." *Id*.

"If the language of the [Certification], considered in light of the structure of the [Certification] as a whole, is plain and capable of legal construction, the language alone must determine the [Certification's] meaning." *NRDC*, 725 F.3d at 1204-05 (quotation marks omitted). If the Certification's text is ambiguous, "we may turn to extrinsic evidence to interpret its terms." *Id*. at 1205. "The fact that the parties dispute [the Certification's] meaning does not establish that [it] is ambiguous; it is only ambiguous if reasonable people could find its terms susceptible to more than one interpretation." *Klamath*, 204 F.3d at 1210.

## DISCUSSION

Plaintiff alleges that Defendants have violated the following conditions of the DEQ Certification: (1) Condition C.1, requiring that the SWW be operated in accordance with the TMP; (2) Condition D.1, requiring that the SWW be operated in accordance with the DOMP; (3) Condition E.1, requiring that the SWW be operated in accordance with the PHMP; and (4) Condition S, requiring that no wastes be discharged and no activities conducted that would violate state water quality standards. To support these contentions, Plaintiff relies on monitoring data showing numerous days on which Project discharges did not comply with criteria cited in the WQMMP. Plaintiff asserts that each of these "exceedances" constitutes a violation of the Certificate. Plaintiff also argues, in a post-hearing memorandum, that, even if individual water quality exceedances do not constitute violations of the Certificate, Defendants have violated specific requirements in the management plans and the overall adaptive management requirements in the WQMMP. *See* ECF 126.

Defendants argue that Plaintiff is incorrect in asserting that any individual violation of a water quality standard constitutes a violation of the Certificate. Defendants also argue that Plaintiff relies on incorrect criteria for water temperature and dissolved oxygen concentration. Reading the Certificate as a whole, and considering the adaptive management requirements,

Defendants argue, the Project is complying with the Certificate.[3] Amicus DEQ also states its opinion that the Project is in compliance with its Certificate.

## A. Whether the Certificate Requires Strict Compliance with Water Quality Criteria

Conditions C.1, D.1, and E.1 require that the SWW "be operated in accordance with" the TMP, DOMP, and PHMP, respectively. ECF 66-8 at 1, 4, 6. The TMP, DOMP, and PHMP are made "a part of" the Certification. The TMP, DOMP, and PHMP, in turn, incorporate state water quality standards.[4] The TMP states that the SWW "will be operated to blend water from the two intakes when necessary to meet the applicable ODEQ and CTWS temperature standards." ECF 73-7 at 515. Similarly, the DOMP and PHMP provide that the SWW "will be operated . . . to meet the applicable ODEQ and CTWS" standards for dissolved oxygen and pH. *Id.* at 520, 523. Plaintiff argues that the TMP, DOMP, and PHMP require strict compliance with the water quality standards and criteria identified in each plan. Plaintiff therefore argues that because Certification conditions C.1, D.1, and E.1 require Defendants to operate the Project *in accordance with* the TMP, DOMP, and PHMP, any exceedance of the criteria in those plans constitutes a violation of the Certification.

Plaintiff's reading of these Certification conditions is too strict. Although Conditions C.1, D.1, and E.1 incorporate the TMP, DOMP, and PHMP, respectively, the conditions do so by

---

[3] The Tribe also urges the Court to decline to exercise its discretion to issue what its asserts is effectively a declaratory judgment. Although Plaintiff seeks, among other relief, a declaratory judgment that Defendants are violating the CWA, Plaintiff does not bring this case under the Declaratory Judgment Act. Rather, Plaintiff alleges a violation of the Clean Water Act, and seeks declaratory and injunctive relief. Plaintiff has moved for partial summary judgment on the issue of liability—*i.e.*, whether Defendants are violating the CWA. This motion does not convert Plaintiff's Complaint into one arising under the Declaratory Judgment Act. As such, the Court declines to address the factors applicable to a court's discretion to hear a suit for a declaratory judgment.

[4] As discussed above, the TMP and DOMP incorporate what are now outdated state water quality standards for temperature and dissolved oxygen.

stating that the management plans "shall identify those measures that the Joint Applicants *will undertake to reduce the Project's contribution to exceedances of water quality standard criteria for*" temperature, dissolved oxygen, and pH. *See* ECF 66-8 at 1, 4, 6 (emphasis added). Thus, according to the text of the Certification itself, the purpose of the management plans is to prescribe the measures and processes Defendants are to use in operating the Project, with the goal being to reduce exceedances of water quality standards. Additionally, with respect to monitoring, Section C.2 states:

> The WQMP shall specify the temperature monitoring reasonably needed to determine (a) *whether the temperature criteria continue to be exceeded* in waters affected by the Project, (b) the success of the TMP in *reducing the Project's contribution to any continued exceedances* of the criteria, and (c) any additional measures that may be needed to *reduce the Project's contribution to exceedances* of the criteria.

*Id.* at 1 (emphasis added). Sections D.2 and E.2 mirror Section C.2 with respect to dissolved oxygen and pH monitoring. *See Id.* at 4, 6. By providing that the WQMP identify monitoring necessary to determine whether each of these criteria *continues to be exceeded*, the Certification anticipates that, at least for a time after issuance of the Certification, water quality criteria contained in the WQMMP would not be met. The text of these provisions thus suggests only that Defendants are required to follow the steps on the TMP, DMP, and PHMP, and to monitor conditions, in an effort to *reduce* these acknowledged exceedances.

There is, however, some support in the WQMMP for Plaintiff's proposed interpretation of the Certification requirements—*i.e.*, that daily compliance with individual water quality criteria is mandatory. It is clear that the drafters of the WQMMP expected that, if operated in accordance with the WQMMP, the Project *would* comply with state water quality standards. Thus, the stated *purpose* of the various actions and measures identified in the WQMMP's management plans is to ensure compliance with these standards. The TMP explains that, based

on a series of scientific models developed, particular blends of water "*will result in compliance with the temperature standard throughout the year.*" ECF 73-7 at 515. The DOMP similarly contemplates that the percentages of surface and bottom withdrawals anticipated would result in dissolved oxygen concentrations meeting the applicable water quality standards. *See* ECF 73-7 at 520. The TMP refers to the temperature standard that "must be satisfied." *Id*. at 515. The DOMP directs that the SWW "be operated to blend water from the two intakes *to meet the applicable ODEQ and CTWS DO standards*," noting that additional existing facilities "may also be used to comply . . . if needed." *Id*. at 520 (emphasis added). Under certain conditions, the DOMP requires Defendants to "institute controlled spills at the Reregulating Dam *to maintain ambient DO concentrations*" at target levels. *Id*. at 521. The WQMMP predicts that the regime proposed "for the management of temperature and DO will suffice for management of pH as well."[5] *Id*. at 523.

Plaintiff also derives significant meaning from Condition S of the Certification, which states: "Notwithstanding the conditions of this certification, no wastes shall be discharged and no activities shall be conducted which will violate state water quality standards." ECF 66-8 at 17. Plaintiff relies on this Condition to argue that the exceedances it has identified constitute violations of the Certification. For two reasons, however, Condition S does not support Plaintiff's argument. First, Condition S refers only generally to "state water quality standards." The only reasonable way to interpret this is to conclude that it refers to the water quality

---

[5] The PHMP, however, in contrast to the TMP and DOMP, demonstrates an expectation that pH target levels may *not* be met, providing that pH may exceed target levels when "all practical measures are being employed to minimize exceedances." ECF 73-7 at 523. The PHMP also includes a plan of action for when pH levels are not as expected: "if pH at the Reregulating Dam is found to exceed that of the weighted average of the inflows, the Joint Applicants will immediately contact ODEQ and CTWS WCB to develop an approach to reduce pH that is consistent with maintaining compliant temperature and DO values and surface withdrawal volumes necessary to facilitate smolt movement in Lake Billy Chinook." *Id*. at 524.

standards *in existence at any given time*. With respect to temperature and dissolved oxygen, those standards, as discussed further below, are less restrictive than the ones upon which Plaintiff relies to assert ongoing violations. Second, the general text in Condition S cannot serve to override the more specific and detailed provisions in C.1, D.1, and E.1, as well as in the WQMMP itself. The Court must read the Certification as a whole, and cannot read one Condition in a manner that would contradict or fail to give effect to various other conditions in a certification. *See NRDC*, 725 F.3d at 1206. In context, the Court interprets Condition S as a type of "savings clause," not meant to override more specific, carefully planned provisions, but rather to provide for unexpected eventualities, such new activities conducted at the Project or the emission of a new pollutant.

Finally, Plaintiff argues that because a Certificate is defined, under Oregon law, as a determination by DEQ that an activity *will comply* with water quality standards, the Certificate in this case prohibits any violations of water quality standards. Although OAR 340-048-0010 defines a "Certification" in those terms, a different provision, OAR 340-041-002, defines a Section 401 Certificate as "a determination made by DEQ that a . . . federally licensed or permitted activity that may result in a discharge to waters of the state has adequate terms and conditions to prevent an exceedance of water quality criteria." OAR 340-041-002. Under either definition, however, on this point, Plaintiff's disagreement would be with the Certificate itself—and with DEQ's approval of it. As Plaintiff acknowledges, a Certificate, and, in this case, the incorporated WQMMP, is a determination that, if operated as directed, water quality standards *will be met*, assuming the conditions in the Certificate are followed. Here, those conditions include the management and monitoring plans for the Project. To the extent it has turned out *not* to be the case that operation of the SWW pursuant to the management plans can result in

compliance with state water quality standards, the appropriate challenge would be to DEQ's approval of the Certification itself—not to Defendants' operation of the Project.

The Court must read the Certificate as a whole, and give it its most reasonable interpretation. Although the WQMMP itself contains *some* mandatory language, it also reflects a genuine expectation that, if the SWW is operated in accordance with the plan—such as by releasing the specific blends of bottom and surface water identified—compliance with water quality standards would result. Because the Certificate explicitly recognizes that water quality standards were already being exceeded at the time it was issued, it would be unreasonable to conclude that any given exceedance necessarily constitutes a violation of the Certificate. Furthermore, although the Certificate incorporates by reference the WQMMP, making the WQMMP a "part" of the Certificate, in doing so, the Certificate also explains the purpose of the WQMMP: to identify the measures Defendants are to undertake to *reduce* the Project's contribution to exceedances of water quality standards. Operating the Project "in accordance" with those plans, then, means using the techniques identified to work toward compliance, and following the overall mandate to use adaptive management. This comports with the State's own definition of what a § 401 Certificate is, and with DEQ's understanding of the Certificate and WQMMP in this case. In the agency's view, "[t]he WQMMP describes in detail the measures to be carried out by the Licensees to ensure compliance with applicable water quality standards throughout the license term." ECF 95 95 ¶ 28. "Compliance with the project's 401 certification is determined in light of progress with meeting or implementing *conditions* of that certification. These conditions required a large construction project that facilitated blending surface and bottom water to improve water quality in the lower Deschutes River. The project also facilitates fish passage downstream from the reservoirs." ECF 95 ¶ 30. The Court concludes that the

exceedance alone of water quality criteria in the TMP, DOMP, or PHMP does not necessarily constitute a violation of Condition C.1, D.1, E.1, or S.

## B. Water Temperature

Condition C.1, which relates to temperature, requires that Defendants operate the SWW in accordance with the TMP. The TMP, in turn, describes the measures that Defendants will undertake in an effort to reduce the Project's contribution to water temperature exceedances. The TMP calls for adaptive management of the SWW, taking into consideration all water quality criteria and fish passage goals. The TMP anticipates that Blends 13 and 16 will result in compliance with state temperature criteria. It also, however, requires Defendants to take certain steps when temperature "approaches the maximum limit." When this happens, Defendants are to increase the percentage of deep water discharged. The TMP expects Defendants automatically to adjust the withdrawal blend in order to meet the "applicable" temperature standard.

### 1. Applicable Standard

As an initial matter, the parties dispute the "applicable" temperature standard. The TMP provides: "[t]he applicable ODEQ . . . water quality standards can be found in OAR 340-41." ECF 73-7 at 515. Section 2.2 of the TMP, titled "Application to the Pelton Round Butte Hydroelectric Project" states: "As required by the [CWA], the temperature standard that must be satisfied for the lower Deschutes River below the Project's Reregulating Dam is the most stringent applicable standard, the State's bull trout standard."[6] *Id*. at 515. The bull trout standard, however, is no longer applicable to the Deschutes River below the Project. Thus, the water

---

[6] ODEQ and WCB interpreted this "to restrict the PRB Project from warming the water discharged into the lower Deschutes River below the Reregulating Dam more than 0.25°F over what would occur at that location in the river if the PRB Project were not in place, when surface waters exceed 50°F (10°C) or when federally listed Threatened and Endangered species use the river." ECF 73-7 at 515.

quality standard now "found in OAR 340-41" is a different, less stringent standard. *See* OAR 340-041-0028(4)(a)-(b), -0130(2), Figure 130A, and Figure 130B.

Defendants argue that the Interim Agreements—which Defendants characterize as "revisions" to the WTP's temperature objectives—contain the temperature criteria currently applicable to the Project. The temperature goals identified in the Interim Agreements are actually more stringent than the State temperature standards identified in OAR 340-041. Defendants argue that these revisions are authorized by Certification Conditions C.7 and D.6. Relying on Condition N, which governs Certification modification, Plaintiff argues that the Interim Agreements do not validly modify the temperature standards or the TMP because DEQ did not follow procedures required for a modification of the Certification.

Condition N outlines various procedures that DEQ must follow to modify a Certification. ECF 66-8 at 16; *see also* OAR 340-048-0050(2) (procedures to modify or revoke a certification). Plaintiff argues that because the Certification explicitly made the WQMMP a "part of" the Certification, modifications to the WQMMP must undergo these procedural requirements, and the Interim Agreements fail to modify the TMP because they did not do so. Section C.7 of the Certification explicitly provides, however, for modification of the WQMMP:

> With the approval of ODEQ, the Joint Applicants may cease implementing the TMP and WQMP or may implement a modified TMP and WQMP. ODEQ may approve termination or modification if ODEQ determines that it will not impair the achievement of any LA for the Project for temperature and will not contribute to the exceedance of the relevant temperature criterion in waters affected by the Project.

ECF 66-8 at 3. Thus, under the Certification, Defendants may cease implementing the TMP, or implement a modified TMP, with DEQ approval and subject to certain conditions.

The Interim Agreements, however, do not *purport* to modify the WQMMP.[7] Defendants also point to no evidence demonstrating that DEQ determined that the provisions of the Interim Agreements would "not impair the achievement of any LA for the Project for temperature." Thus, although a modification of the TMP may have been proper, it is not clear that the Interim Agreements *did* modify the TMP.

Nonetheless, the Interim Agreements support the conclusion that the state's current temperature standard, rather than the outdated standard discussed in the TMP, applies to the Project. Plaintiff argues that because, at the time the WQMMP was finalized, all parties were (or should have been) aware of the new temperature criteria, and yet did not revise the TMP to reflect those criteria, the WQMMP's drafters intended the older, more strict standards to apply to the Project. The TMP states, however, in 2.1, that the "applicable" water quality standards are those "found in OAR 340-41." This reflects a clear intention to tie the applicable water quality standards to current state water quality standards. Section 2.2 then merely describes and *applies* those standards to the Project, by identifying which standard applies to the specific waterway and region at issue in this case, and providing the means by which the Project would be operated to achieve those standards.

### 2.  Whether the Project's Temperature Exceedances Violate the Certificate

Plaintiff does not argue that the Project violates the Certification under the updated water quality standards. Thus, to the extent Condition C.1 or Condition S requires strict compliance with state water quality standards, Plaintiff has not established a violation of the temperature

---

[7] The 2017 Interim Agreement states that after additional monitoring and meetings, DEQ would "determine whether PGE should file a revised WQMMP that incorporates the measures needed to satisfy the temperature and D.O. standards DEQ determines to be applicable in the Deschutes River below the Reregulating Dam." ECF 90-7 at 3. DEQ would then determine, pursuant to OAR 340-048-0050, whether modification of the Certification would be necessary to incorporate any revised WQMMP.

standard. Furthermore, and even if the temperature standard discussed in the TMP applied, to establish a violation of Condition C.1, Plaintiff would have to show more than the exceedance of criteria; Plaintiff would have to show that Defendants failed to comply with specific measures called for in the TMP, or failed to use adaptive management. The TMP provides that Defendants will operate the SWW in such a way as to meet state temperature standards and to reduce overall temperatures in Project reservoirs. To do so, Defendants are to increase the amount of colder bottom water discharged from the Reregulating Dam. Any adjustments to the operation of the SWW, however, "must consider all possible impacts" to the water and surrounding resources.

Although the WQMMP predicted that simultaneous compliance with state water quality standards may be possible, the drafters also recognized that they did not have perfect information; as such, they required adaptive management in the operation of the SWW for the purpose of working towards compliance. As discussed above, reducing temperatures in the river adversely affects fish passage, dissolved oxygen, pH, and the ability to control temperatures later in the year. It is sometimes impossible for the Project simultaneously to achieve all water quality and fish passage objectives.[8] ECF 90 ¶ 11. Under these circumstances, the TMP requires an adaptive management approach, considering all relevant objectives.

Defendants have worked closely with DEQ since the SWW began operating—when issues arose making it impossible for Defendants to meet the stated temperature goal in the TMP, Defendants entered into Interim Agreements with DEQ establishing achievable goals for the Project and new methods of compliance. Defendants assert, and Plaintiff does not dispute, that at all times since and including 2011 when the temperature objectives in the Interim Agreements—

---

[8] Although Plaintiff denies the *significance* of the fact that it is sometimes impossible for the Project, to comply with all water quality standards, Plaintiff does not dispute that it is a fact. Plaintiff argues, essentially, that it is Defendants' responsibility to find ways to comply with all applicable water quality standards, and with fish passage.

which are more stringent than the current state water quality standards—were not being met, the SWW was withdrawing either a percentage of deep water that exceeded what is called for by Blend 17, identified in the Interim Agreements, or the maximum percentage of deep water that was possible. The current operation of the SWW, according to DEQ, "increases the likelihood that there will be available cold water." *Id*. This is just the sort of consideration that the WQMMP requires Defendants to take into consideration.

The Court concludes that the undisputed evidence fails to establish that the Project is operating in violation of the temperature requirements in the Certification.

## C. Dissolved Oxygen Concentration

Condition D.1., which relates to dissolved oxygen, requires that Defendants operate the SWW in accordance with the DOMP. The DOMP, in turn, describes the measures that Defendants will undertake in an effort to reduce the Project's contribution to dissolved oxygen exceedances. The DOMP calls for adaptive management of the SWW, taking into consideration all water quality criteria and fish passage goals. The DOMP explains that Blends 13 and 16 will result in compliance with state dissolved oxygen criteria. The DOMP also, however, explains what Defendants will do in the event that dissolved oxygen concentration threatens to drop below the applicable standard.

### 1. Applicable Standard

The parties dispute the applicable criteria for dissolved oxygen. As with temperature, Section 3.1 of the WQMMP, which is a part of the DOMP, provides that "[t]he applicable ODEQ . . . water quality standards can be found in OAR 340-41." ECF 73-7 at 520. Section 3.2 of the DOMP explains that salmonid spawning criteria apply to the Deschutes River downstream of the Project during periods of salmonid spawning and incubation. Under the spawning criterion

for dissolved oxygen, dissolved oxygen may not fall below 9.0 mg/L.[9] Section 3.2 also states that in the Deschutes River below the Project, the salmonid spawning criterion applies year-round.

In issuing new water quality standards, DEQ designated fish use and spawning periods for salmon and steelhead trout. The current standard provides:

> For water bodies identified as active spawning areas in the places and times indicated on [various tables and figures set out in OAR 340-041-0101 to 340-041-0340] (as well as any active spawning area used by resident trout species), [the spawning criterion applies] during the applicable spawning through fry emergence periods set forth in the tables and figures and, where resident trout spawning occurs, during the time trout spawning through fry emergence occurs.

OAR 340-041-0016(1). Otherwise, "[f]or water bodies identified by [DEQ] as providing cold-water aquatic life, the dissolved oxygen may not be less than 8.0 mg/l as an absolute minimum." OAR 340-041-0016. Where this standard is not attainable due to atmospheric conditions, "dissolved oxygen may not be less than 90 percent of saturation." *Id.* DEQ also has discretion to set the standard as requiring that dissolved oxygen "may not fall below 8.0 mg/l as a 30-day mean minimum, 6.5 mg/l as a seven-day minimum mean, and . . . 6.0 mg/l as an absolute minimum." *Id.*

Plaintiff argues that the spawning criterion should apply year-round, as stated in the WQMMP. Although the spawning criterion itself has not changed, the designated fish uses and spawning periods—themselves part of water quality standards—are new. For the reasons discussed above with respect to temperature, however, the Court concludes that the current

---

[9] When the DOMP was written, it noted that a higher standard of 11.0 mg/L applied "in light of currently available information," but that final determination with respect to whether a 9.0 mg/L standard or 11.0 mg/L standard applied would require some analysis after beginning operation of the SWW. ECF 73-7 at 520. DEQ has since concluded, based on four years of data, that the spawning criteria is the lower 9.0 mg/L standard. ECF 90-7 at 2. Plaintiff takes the position that the higher standard of 11.0 mg/L may still apply but, for purposes of summary judgment, relies on the lower standard of 9.0 mg/L.

standards are the standards applicable to the Project. The Interim Agreements, beginning in 2014, recognized that "[w]hen the WQMMP was written, DEQ applied the spawning criterion . . . on a year-round basis," but that "[s]ince that time, the state standard . . . has changed and the spawning criterion only applies from October 15th to June 15th." ECF 90-4 at 2; *see also* ECF 90-5 at 2; ECF 90-6 at 2; ECF 90-7 at 2.

Based on the associated tables and figures, the parties agree that under these criteria, the spawning period for anadromous salmon and steelhead below the Reregulating Dam is between October 15 and June 15. *See* OAR 340-041-0016, Figure 130B (ECF 108 at 16). Plaintiff argues that applying the spawning criterion only until June 15 on this basis alone fails to account for resident trout, the presence of which renders the spawning criterion applicable "during the time trout spawning through fry emergence occurs." OAR 340-041-0016(1). Plaintiff asserts, based on a scientific study and from statements of individuals who frequently use the Deschutes River, that resident trout spawning occurs much later than June 15 in the lower Deschutes River. ECF 108 ¶ 9; ECF 71 ¶ 34. Thus, Plaintiff argues, it was proper for the DOMP to apply the spawning criteria year-round. Notably, however, in making this argument, Plaintiff relies on the *current* standard, rather than on any specifics in the DOMP. In fact, the DOMP purports to apply the spawning criterion year-round not because of resident trout, but rather based on "periods of salmonid spawning and incubation." ECF 73-7 at 520.

More importantly, however, DEQ, the agency responsible for state water quality standards, has concluded that the spawning criterion applies—even for resident trout—only between October 15 and June 15. DEQ is the agency responsible for devising water quality standards and submitting those standards for EPA approval pursuant to the CWA, 33 U.S.C. § 1313(c). On February 4, 2004, DEQ wrote a letter to the EPA, in response to EPA questions on

the state's new water quality standards, regarding, among other things, "the application of [Oregon's] dissolved oxygen criteria to resident fish spawning." ECF 118-1 at 2. DEQ recognized that the state's revised rules "clarified spawning locations and timing for anadromous fish and Lahontan Cutthroat Trout," but that "[d]ue to a lack of site specific data for species other than these, and since temperature criteria for spawning were not established for other species, no similar clarification was made for resident trout . . . or char (bull trout) spawning." Id. at 4. DEQ explained that in applying the dissolved oxygen spawning criteria, DEQ would deem "residential trout spawning . . . to occur from January 1-June 15 each year," "[f]or waters designated as core cold water habitat." ECF 118-1.[10] The Deschutes River below the Project is deemed core cold water habitat. OAR 340-041-0130(2), Figure 130A (ECF 118-2 at 2). The Court concludes that it is proper to rely on DEQ's interpretation of its own standards.[11]

Thus, under the current standards, the spawning criteria, which is 9.0 mg/L, applies between October 15 and June 15. See OAR 340-041-0016(1). During the rest of the year, the criterion for cold-water aquatic life applies, which means that dissolved oxygen may not be 8.0 mgL as a 30-day mean minimum, 6.5 mg/L as a seven-day minimum mean, and 6.0 mg/L as an absolute minimum. OAR 340-041-0016(2); Table 21.

---

[10] The Court notes that this letter followed shortly after the decision in *Nw. Envtl. Advocates v. U.S. E.P.A.*, 268 F. Supp. 2d 1255, 1265-66 (D. Or. 2003), in which the court found that the EPA had abused its discretion by approving Oregon's time and place designations relating to uses of specific waterways. As the court explained, EPA's approval was "specifically premised on the state's ability to designate where rearing occurs." *Id.* The state had concluded that "limited or no information exist[ed] for certain water bodies," and the EPA identified several problems in the state's system for designating uses, finding that the state "lacked critical information on waterways and misidentified the times and places where spawning, rearing, and incubation occurred." *Id.* at 1267. The court found that "[w]ithout accurate time and place designations, EPA cannot approve Oregon's revised criteria and comply with the CWA." *Id.*

[11] Notably, Section 2.2 of the TMP explains the state's water temperature standard based on DEQ's interpretation.

## 2. Whether the Project's DO Exceedances Violate the Certificate

When the 9.0 mg/L spawning criterion applies, the DOMP requires Defendants to operate the SWW in the following way:

> If DO concentrations measured in the Round Butte Dam tailrace fall below 10 mg/L, the Joint Applicants will closely monitor discharge at the Reregulating Dam. If the seven-day mean minimum dissolved oxygen concentration in the discharge from the Reregulating Dam drops below 9.5 mg/L, the Joint Applicants will notify ODEQ and the WCB. The Joint Applicants will institute controlled spills at the Reregulating Dam as the Joint Applicants determine necessary to maintain DO concentrations above 9.0 mg/L.

ECF 73-7 at 522.

Plaintiff argues that every day on which Project discharges were below 9.0 mg/L, and in which Defendants did not institute spill, including full spill, to maintain dissolved oxygen levels in the Project discharges, is a violation of the DOMP. Plaintiff's claim is based on application of a year-round spawning criterion. Defendants assert, and Plaintiff does not dispute, that most of the dissolved oxygen violations Plaintiff alleges complied with dissolved oxygen requirements under the partial-year spawning criterion. Additionally, according to Defendants, on days on which the applicable dissolved oxygen criteria was not met, the Project initiated spills at the Reregulating Dam, as required by the DOMP.

Defendants acknowledge that for several days in October and November of 2017, the Project did not meet the applicable criteria for dissolved oxygen, and did not institute spill at the Reregulating Dam, due to an oversight. ECF 90 ¶ 37. The Supreme Court has held that the citizen suit provision of the Clean Water Act "does not permit citizen suits for wholly past violations." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found*., 484 U.S. 49, 64 (1987). Plaintiff does not provide any other evidence to support ongoing exceedances of the dissolved oxygen standards, or of the DOMP.

Furthermore, even if the year-round spawning criterion applied, and even if the Project did not initiate spill on days where the year-round spawning criterion was not met, Plaintiff has not established that Defendants failed to meet their adaptive management obligations. Defendants have worked closely with DEQ to determine the best way to operate the SWW. This includes establishing, in the Interim Agreements, the standards that should be met, taking into consideration all of the relevant goals. As discussed above, the Certification does not require absolute compliance with all water quality criteria discussed in the WQMMP, particularly under circumstances where it would be impossible to comply with all applicable criteria and to ensure fish passage. The court concludes that the undisputed evidence fails to establish that the Project is operating in violation of the dissolved oxygen concentration requirements in the Certification.

## D. pH Concentration

Condition E.1 of the Certification requires that the SWW "be operated in accordance with the pH Management Plan contained in the WQMMP." POMP refers, like the TMP and DOMP, to OAR 340-041 for the applicable pH standards. The parties agree that the applicable water quality standard for pH in the lower Deschutes River is that "pH values may not fall outside" the range of 6.5-8.5 in river below the Project. *See* OAR 340-041-0021; OAR 340-041-0135(1)(a) (Basin-Specific Criteria)). The same standard applies within the Project reservoirs, except that there is an exception allowed for "exceedances of 8.5 in instances where all practical measures are being employed to minimize exceedance." ECF 73-7 at 523.

The PHMP anticipates that "Project discharge pH will be lower than that of the weighted average of the three inflows." *Id*. at 524. But, "if pH at the Reregulating Dam is found to exceed that of the weighted average of the inflows," Defendants must "immediately contact ODEQ and the CTWS WCB to develop an approach to reduce pH that is consistent with maintaining compliant temperature and DO values and surface withdrawal volumes necessary to facilitate

smolt movement in Lake Billy Chinook." *Id*. The PHMP also recognizes that Project discharge pH could exceed inflow pH due to withdrawal of surface water, and that a "likely modification would be the reduction in the amount of surface withdrawal relative to bottom withdrawal." Any such change "would be determined on a case-specific basis, if such modification can be undertaken consistent with temperature, DO, and fish passage considerations." *Id*.

Plaintiff argues that Project discharges since SWW operations began have regularly exceeded the applicable pH standard. Plaintiff cites data from Defendants' monthly water quality reports to ODEQ, asserting that there have been 482 days since January 1, 2012, in which Project discharges exceeded 8.5 Standard Units. Plaintiffs argue that each of these instances is a violation of the Section 401 Certification, of Oregon's water quality standards, and of the CWA.

Defendants respond that the PHMP requires Defendants only to measure pH weekly in the three tributaries of the Project, and compare the weighted average of the pH of the three inflows," and to notify DEQ and WCB if pH at the Reregulating Dam is found to exceed that weighted average. In this respect, Defendants' interpretation of the PHMP is too narrow. The PHMP requires Defendants to work toward compliance with pH criteria—albeit only to the extent doing so is consistent with other standards and goals—and, as with the other management plans, to use adaptive management.[12]

Plaintiff's theory of liability, nonetheless, is too simple. As discussed above, the Certification does not imply that every given exceedance of a water quality standard constitutes a violation of the Certification. This is particularly apparent with respect to pH levels, because the PHMP's approach to pH management is highly deferential to temperature, dissolved oxygen, and

_____

[12] Defendants also respond that the pH objective in the PHMP is only "no Project increase in pH when the pH in the river exceeds 8.5," citing Sections 4.4-4.6 of the WQMMP. These sections do not support this assertion.

fish passage goals. In supplemental briefing, Plaintiff argues that even if individual pH exceedances do not violate the Certification, Defendants are required to reduce the amount of surface withdrawal when pH exceedances occur. As Plaintiff acknowledges, however, such action may only be taken if it is "consistent with temperature, DO, and fish passage considerations." ECF 73-7 at 524. Plaintiff argues that this does not obviate the obligation to undertake this specific action—reducing surface withdrawals. That is, however, precisely what it does. Standards for pH are explicitly deprioritized in the WQMMP. DEQ's interpretation of the PHMP supports this understanding: according to DEQ, the PHMP "establishes a clear priority that DEQ interprets as direction to maintain high water quality with respect to temperature and dissolved oxygen, facilitate fish passage, and then mitigate pH as much as possible." ECF 95 ¶ 35. Defendants present evidence—and Plaintiff does not dispute—that there are no measures that can lower pH without adversely affecting temperature, dissolved oxygen, and fish passage. ECF 95 ¶ 32; ECF 89 ¶ 12; ECF 90 ¶¶ 9, 40. In such a situation, and in light of the WQMMP's adaptive management considerations, the Project's exceedance of pH values does not violate the Certification.

Plaintiff argues that the Certification and the PHMP must be interpreted in light of Oregon's "Antidegradation Policy," which dictates that "water quality limited" waters "may not be further degraded." Plaintiff argues that in issuing a certification, DEQ was required to determine that the Project would comply with state water quality standards, including the Antidegradation Policy. This is essentially a continuation of Plaintiff's argument that any exceedance of a water quality standard necessarily constitutes an exceedance of the *Certification* issued to Defendants, because a certification certifies that a given activity will not violate water quality standards. The Certification directs Defendants to operate the Project in accordance with

the WQMMP. The WQMMP, in turn, provides the procedures by which it was believed—based on scientific research and modeling—that the Project would conform to water quality standards. That this calculation may have been *wrong* does not necessarily mean that Defendants are violating their Certification.

Plaintiff also argues that Defendants are violating the requirement to notify DEQ on days when pH levels at the Reregulating Dam exceeds inflow pH and to devise a plan to reduce pH. Defendants assert, and Plaintiff does not dispute, however, that PGE has reported pH exceedances to DEQ and to the Tribe's WCB, as required by the DOMP. The requirement that Defendants and DEQ thereafter develop a plan to reduce pH must be interpreted in light of othe requirements in the Certification, namely, that pH be managed only to the extent possible without negatively affecting water temperature or dissolved oxygen concentration. When there are simply no measures that could accomplish this goal, the requirement that a plan be developed is rendered null. The Court concludes that the undisputed evidence fails to establish that the Project is operating in violation of the pH requirements in the Certification.

## CONCLUSION

Plaintiff has not shown a genuine dispute of material fact sufficient to support its contention that Defendants are operating the Pelton Round Butte Hydroelectric Project in violation of Conditions C.1, D.1, E.1, or S of the Project's CWA § 401 Certificate. Accordingly, Plaintiff's motion for partial summary judgment (ECF 65) is DENIED, and Defendants' cross-motions for summary judgment (ECF 86, ECF 122) are GRANTED. This case is dismissed.

**IT IS SO ORDERED**.

DATED this 3rd day of August, 2018.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge